UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| NEW ENGLAND SURFACES, d/b/a DION DISTRIBUTORS, INC., | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Docket No. 06-cv-89-P-S |
| E.I. DU PONT DE NEMOURS & COMPANY d/b/a DUPONT, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Before the Court is the Motion for Preliminary Injunction (Docket # 4) by Plaintiff New England Surfaces ("NES").  At this time, NES seeks injunctive relief against Defendant E.I. Du Pont de Nemours and Company ("Du Pont").  The Court previously ordered expedited briefing on this Motion and then held oral argument on May 24, 2006.  Having considered all of the written submissions made in connection with the Motion as well as the presentations at oral argument, the Court now DENIES the Motion.

I.      FACTUAL BACKGROUND

This case presents a business dispute between Du Pont, a company that produces various high-end countertop products, and NES, an authorized distributor of those Du Pont products in the greater New England area.  NES has served as a Du Pont distributor for over thirty-five years and Du Pont currently supplies seventy-five percent of the product distributed by NES.  Most recently, NES' authorized distribution area for Du Pont products

1

has included Maine as well as parts of Massachusetts, Rhode Island, Connecticut, New Hampshire and Vermont.

By letter dated April 4, 2006, Du Pont notified NES that it intended to terminate its relationship with NES as of June 4, 2006.  Under the terms of the written agreement between NES and Du Pont, "either party may terminate [the] Agreement with or without cause, upon at least thirty (30) days prior written notice."   (Agreement (Ex. A to Aff. of John B. Charamella (Docket # 23)) at ¶2A.)  Thus, it appears that Du Pont's rather sudden termination complies with the plain language of the parties' Agreement.

Nonetheless, NES' Amended Complaint (Docket # 18) presses a number of claims against Du Pont, all of which arise from Du Pont's termination and/or actions under taken by Du Pont in connection with the termination of NES.  NES asserts Du Pont has violated the following statutes:  (1) Connecticut Franchise Act, Conn. Gen. Stat. Ann. § 42-133l (Count I); (2) Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110b(a) (Count II); (3) Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws Ann. ch. 93A § 1 et seq. (Count III); (4) New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358 A:1 (Count IV); (5) Vermont Unfair Trade Practices Act, 9 V.S.A. § 2451 et seq. (Count V) and (6) Maine's Antitrust Statute, 10 M.R.S.A § 1101 et seq. (together, the "statutory claims").  In addition, NES asserts tort claims, including claims of (1) Fraud and Misrepresentation (Count VI), (2) Negligent Misrepresentation (Count VII), (3) Breach of Fiduciary Duty (Count VIII), (4) Aiding & Abetting Tortious Conduct (Count IX), (5) Promissory Estoppel (Count X), (6) Breach of Covenant of Good Faith and Fair Dealing (Count XI), (7) Tortious Interference with Contractual Rights and Prospective Economic Interests (Count XII), (8) Unreasonable Termination Pursuant to Distribution Agreements (Count XIII), (9) Unconscionability (Count

XIV), (10) Punitive Damages (Count XV), and (11) Misappropriation of Confidential Information (Count XVI) (together, the "tort claims").

At this time, NES presses for injunctive relief in order to delay the June 4, 2006 termination.  Via various affidavits, NES has established on the record that if Du Pont's termination of their distributorship is not extended beyond June 4, 2006, NES will be unlikely to survive as a business.  However, at oral argument, counsel for NES indicated that if Du Pont were to delay its termination of NES for a period of approximately three to six months, NES would have the necessary time to establish a relationship with another competing distributor and thereby survive as a business.

## II.     LEGAL STANDARD

For Plaintiff to prevail on its motion for a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure, it bears the burden of demonstrating (1) a likelihood of success on the merits, (2) irreparable injury, (3) that such injury outweighs any harm to the defendant, and (4) that the injunction would not harm the public interest. See, e.g., Largess v. Supreme Judicial Court, 373 F.3d 219, 224 (1st Cir. 2004). "The decision whether to grant relief is based on a balancing of the different factors, with likelihood of success playing a pivotal role."  Id.  In general, "[p]reliminary injunctions must be used sparingly and only in cases where the need for extraordinary equitable relief is clear and plain."  Augusta News Co. v. News America Publ'g Inc., 750 F. Supp. 28, 31 (D. Me. 1990) (citations omitted).

## II.      DISCUSSION

### A.      Likelihood of Success

As to the critical likelihood of success factor, the Court cannot find a substantial likelihood of success on any of Plaintiff's numerous claims.  Rather, at this juncture, there appear to be multiple difficult legal questions that will need to be addressed before Plaintiff's likelihood of success can be discerned.  These questions include an initial question regarding choice of law.  Notably, the Agreement between the parties calls for the application of Delaware law.  The parties clearly disagree on the application of the Agreement's choice of law provision to Plaintiff's claims.  NES argues that Delaware law does not apply to the claims it has asserted since its claims "do not sound in contract" and do not seek redress for "rights or remedies" arising under the Agreement. (See Pl.'s Reply (Docket # 32) at 10.

Even assuming the Court were to apply Maine law to Plaintiff's multiple tort claims, there would be a significant legal question regarding whether the economic loss doctrine might apply to bar such tort claims.  See, e.g., Maine Rubber Int'l v. Environmental Mgmt. Group, Inc., 298 F. Supp. 2d 133, 136-38 (discussing and ultimately predicting an extension of the Law Court's ruling in Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc., 659 A.2d 267 (Me. 1995)).  Notably, even under Delaware law, the question of whether the economic loss doctrine might bar some or all of Plaintiff's tort claims would be a significant legal question.  See, e.g., McKenna v. Terminex Int'l Co., No. 04C-01-022RBY, 2006 WL 1229674 (Del. Super. March 13, 2006).  On the record currently before the Court, the Court believes that the economic loss doctrine is a substantial hurdle to Plaintiff's pursuit of tort claims in this matter.

With respect to Plaintiff's statutory claims, Plaintiff primarily argues that it is entitled to injunctive relief based on the Connecticut Franchise Act, Conn. Gen. Stat. Ann. § 42-133l. Specifically, Plaintiff invokes Section 42-133v(g), which does explicitly require that a franchise agreement "remain in full force and effect . . . for a period of six months following a final determination by the court of competent jurisdiction" when a franchisee brings an action to challenge the cancellation of a franchise agreement.  Conn. Gen. Stat. Ann. § 42-133v(g). Based on the submissions of the parties as well as defense counsel's representations at oral argument, there is little doubt that Du Pont's cancellation of its distribution agreement with Plaintiff was done without cause and, as such, does not comply with Section 42-133l(a).

However, it is far from clear that the Agreement between NES and Du Pont is covered by the Connecticut Franchise Act.  As a preliminary step, the Connecticut Franchise Act applies only to franchise agreements that "contemplate[] or require[] the franchisee to establish or maintain a place of business in [Connecticut]."  Conn. Gen. Stat. Ann. § 42-133h. Although the parties appear to agree that their Agreement did not *require* NES to establish or maintain a place of business in Connecticut, they clearly disagree about whether the Agreement *contemplated* such a move.  Of course, determination of this issue requires the Court to interpret the parties' Agreement, which on its face says nothing about NES maintaining a place of business in Connecticut.  Notably, the Agreement does contain an integration clause as well as an explicit choice of Delaware law.  Thus, on its face, it does not appear that the Agreement is covered by the Connecticut Franchise Act.

The Court would reach this same conclusion even if it were to deem the Agreement a "contract of adhesion," as suggested by NES, rather than an integrated agreement between two sophisticated business entities, which is the position asserted by Du Pont.  Assuming for

the moment that the Agreement between NES and Du Pont is a contract of adhesion, NES would be entitled to have "the provisions of the contract . . . generally construed to meet the reasonable expectations of [NES]." Dairy Farm Leasing Co., Inc. v. Hartley, 395 A.2d 1135, 1139-40 n. 3 (Me. 1978).  NES might also argue that certain provisions of the agreement are unconscionable and ask the Court to enforce the contract minus the unconscionable portions. Barrett v. McDonald Investments, Inc., 870 A.2d 146, 155 (Me. 2005).  However, on the current record, the Court cannot conclude that viewing the Agreement through this more forgiving lense would make it substantially likely that the Agreement is covered by the Connecticut Franchise Act.  Similarly, even considering the Agreement as a contract of adhesion, the Court does not conclude that it is likely that Plaintiff will be able to recover under any tort theory for Du Pont terminating its relationship with NES pursuant to the plain terms of the Agreement.

With respect to Plaintiff's other statutory claims, the Court similarly concludes that Plaintiff has not met its burden of establishing a substantial likelihood of success on the merits.  On the current record, the Court simply cannot say that the explicit terms of the Agreement are clearly unenforceable or that the actions Du Pont has taken in accordance with the Agreement somehow amount to unfair and deceptive trade practices that injure the public or competition generally.

Although the Court concludes that NES has not met its burden of proving a *substantial* likelihood of success on its claims, the Court does not mean to suggest that NES' claims are without merit.  Certainly, the factual allegations that are presented in the record are troublesome and further development of the record may ultimately prove that Plaintiff is entitled to recovery under one or more of its theories.

**B.      Irreparable Harm**

The Court must weigh its above finding regarding the likelihood of success against the irreparable harm that Plaintiff will incur in the absence of an injunction.  If Du Pont proceeds to terminate its relationship with NES on June 4, 2006, there will be substantial and perhaps irreversible harm to NES.  The current record certainly establishes that NES will most likely be forced to close.

On this factual basis, Plaintiff argues that this case is analogous to Semmes Motors, Inc. v. Ford Motor Company, Inc., 429 F.2d 1197 (2d Cir. 1970).  In Semmes, the Second Circuit found irreparable harm would result from the termination of Semmes' Ford dealership since it would cause the loss of a family business that Semmes had operated for twenty years. See id. at 1205.  The Second Circuit then concluded that the strong showing on irreparable harm and balance of the hardships meant that the plaintiff would be entitled to an injunction even if the plaintiff could only show "serious, substantial, difficult and doubtful" legal questions regarding the merits of plaintiff's claims.  Id. at 1206.

There are undoubtedly some common threads between NES and Semmes.  However, the Court believes that the Semmes decision is limited to the unique facts of that case.  See, e.g., Flagship Federal Sav. Bank v. Wall, 748 F. Supp. 742, 747 (S.D. Cal. 1990).  By way of comparison, the Court notes that NES' distributorship is not and has not been solely limited to Du Pont products, although NES has understandably focused its efforts on Du Pont products over the years.  As a result of this focus, there is no doubt that the loss of Du Pont will be very significant in the short term.  However, at oral argument counsel for Plaintiff acknowledged that the "divorce" of NES and Du Pont is, at this point, inevitable and that NES is now in the process of becoming a distributor for one or more of Du Pont's competitors (a process that

NES began after receiving Du Pont's notice of termination). Thus, NES appears to be taking the steps necessary to mitigate the damage done by Du Pont's unfortunate termination.

Admittedly, the success of these mitigation efforts remains to be seen. If this case were to ultimately proceed to the issue of damages caused by Du Pont's June 4, 2006 termination, the damages would likely be very substantial. However, the Court believes those damages also would be quantifiable. Under the unique facts of this case, the Court does not believe that very substantial yet quantifiable damages qualify as irreparable harm. See Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2948.1 at p. 150-51 & n. 4 (collecting cases in which preliminary injunctions were denied because the applicant "ha[d] an adequate alternative remedy in the form of money damages"); Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 38 (2d Cir. 1995) ("[I]rreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial.")

### C. Balance of Hardships & Public Interest

In the context of this case, the Court does not find that there is any public interest that will be harmed by the Court's decision to grant or deny a preliminary injunction. Thus, this particular factor does not enter into the Court's calculus. However, the Court does balance the relative hardships on NES and Du Pont. In the Court's assessment, there is some harm to Du Pont from the forced continuation of its relationship with NES, especially at a time when NES must be actively involved in seeking out other suppliers to replace Du Pont. As the Court has already discussed above, the harm to NES is undeniably substantial and may well lead NES to close entirely. Thus, in the Court's assessment, the balance of the hardships to the parties would tilt in favor of NES and granting an injunction, especially to the extent that,

at oral argument, NES tailored its request to an injunction that would simply delay the termination for at least three months.

The case admittedly presents a close call on the question of a preliminary injunction. Ultimately, if the standard allowed the Court to grant a preliminary injunction based solely upon a finding of imminent and substantial harm and a finding that the balance of the hardships tilted in favor of injunctive relief, NES would likely qualify for a preliminary injunction. However, the standard requires irreparable harm and also requires the Court to consider Plaintiff's likelihood of success on its asserted claims. On the current record, the Court cannot find a substantial likelihood of success. In light of the written agreement between the parties, the Court ultimately concludes that there is no basis for enjoining Du Pont from doing what the apparently valid agreement between Du Pont and NES allows; namely, a termination of the distributorship on at least thirty days notice.

## III.   CONCLUSION

Having weighed all of the relevant factors, the Court concludes that Plaintiff is not entitled to preliminary injunctive relief. Therefore, Plaintiff's Motion for Preliminary Injunction (Docket # 4) is hereby DENIED.

SO ORDERED.

  /s/ George Z. Singal
United States Chief District Judge

Dated on this 1st day of June 2006.

9