UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| NEW ENGLAND SURFACES<br>d/b/a DION DISTRIBUTORS, INC.<br><br>Plaintiff,<br><br>v.<br><br>E.I. DU PONT DE NEMOURS<br>AND COMPANY d/b/a DUPONT<br>and PARKSITE, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)   Docket No. 06-cv-89-P-S<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER ON MOTION TO DISMISS**

Before the Court is a Motion to Dismiss filed by Defendant E.I. Du Pont de Nemours and Company ("DuPont") (Docket # 44).[1] Parksite, Inc. ("Parksite") has joined this Motion (Docket # 49).[2] DuPont and Parksite move to dismiss all but Counts X, XVII, and XIX of Plaintiff New England Surfaces' (NES) Second Amended Complaint (Docket # 65). For the reasons articulated below, the Court GRANTS IN PART and DENIES IN PART the Motion. As explained herein, the Court GRANTS the Motion to Dismiss Counts II, III, IV, V, and XVI.

**I. LEGAL STANDARD**

When considering a motion to dismiss, the Court accepts as true plaintiff's well-pleaded factual averments and draws "all inferences reasonably extractable from the

---

[1] Also before the Court is Defendant DuPont's Motion for Oral Argument/Hearing (Docket # 53). The Court DENIES the Motion and decides the matter on the pleadings.
[2] The Court notes that while Parksite joined the Motion to Dismiss (Docket # 49), it did not separately articulate why claims unique to Parksite should be dismissed.

1

pleaded facts in the manner most congenial to the plaintiff's theory." Roth v. United States, 952 F.2d 611, 613 (1st Cir. 1991). The Court may only dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) when it clearly appears that, on the facts alleged, the plaintiff cannot recover on any viable legal theory. McLaughlin v. Boston Harbor Cruise Lines, Inc., 419 F.3d 47, 50 (1st Cir. 2005); see Fed. R. Civ. P. 12(b)(6).

Ordinarily, a court may not consider any documents outside of the complaint or not expressly incorporated in the complaint on a motion to dismiss, without converting the motion into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). Nonetheless, there is a narrow exception "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Id. When a document is central to the plaintiff's complaint, the document "merges into the pleadings" and may be properly considered by the court in determining a motion to dismiss. See id.

In the present case, most of the above-mentioned elements are present with regard to the Authorized Distributor Agreement and its amendments (hereinafter "Distribution Agreement"). The Second Amended Complaint refers to the Distribution Agreement or its terms numerous times, and several of Plaintiff's claims rest on the Distribution Agreement.[3] Moreover, Defendant DuPont's liability largely depends upon the

---

[3] The Second Amended Complaint references the Distribution Agreement in both explaining the general background and in asserting the nineteen claims. (Second Am. Compl. at ¶¶ 8, 12, 58, 121, 122, 123, 131, 136, 139, 142.) Further, four of Plaintiff's claims directly rest on the interpretation and application of the Distribution Agreement. For example, Count XII, Breach of Covenant of Good Faith and Fair Dealing, states in paragraph 121: "Given the longstanding and close relationship and the disproportionate bargaining power between them, DuPont owed NES a duty of good faith and fair dealing in carrying out terms of the distribution agreement and other agreements and understandings, oral and written, between the two, involving the exercise of NES' rights to distribute DuPont products." (Id. at ¶ 121.) In addition, NES

interpretation and application of the Distribution Agreement. Although NES disputes the relevancy of the Distribution Agreement to the Motion to Dismiss, NES does not dispute its authenticity. Thus, in deciding the pending motion, the Court considers the Distribution Agreement without converting the motion into one for summary judgment.

Taking the facts as presented in the Second Amended Complaint as true and drawing all reasonable inferences in favor of the Plaintiff, the Court lays out the facts of the case below.

## II.     BACKGROUND

This case arises out of the termination of a business relationship between DuPont, a company that produces various high-end countertop products, and NES, an authorized distributor of DuPont products in the greater New England area. NES has operated as an exclusive distributor of DuPont products for over thirty-five years. Most recently, NES' authorized distribution area for DuPont products has included Maine, as well as parts of Massachusetts, Rhode Island, Connecticut, New Hampshire and Vermont. In April 2006, DuPont terminated the business relationship pursuant to a thirty-day termination provision in the Distribution Agreement.

The business relationship between DuPont and NES was controlled by the Distribution Agreement, as well as other written and oral representations. Specifically, the Distribution Agreement contained several provisions pertinent to the present Motion. First, the Distribution Agreement contains a choice of law provision. The Agreement states in paragraph 8.B: "This Agreement, including any rights or remedies arising hereunder, shall be governed and construed in accordance with the laws of the state of

---

alleges claims for Breach of Contract, Unreasonable Termination of Distribution Agreements, and Unconscionability.

Delaware without giving effect to the conflict of law or choice of law provisions thereof." (Distribution Agreement at ¶ 8.B Attach. # 1 to Docket # 44.)  Second, the contract provides a termination provision, which states that "either party may terminate this Agreement with or without cause, upon at least thirty (30) days prior written notice."  (Id. at ¶ 2.A.)  In addition, NES alleges and the Court assumes for purposes of this Motion to Dismiss, that DuPont made oral representations that the contract would not be terminated without cause.

NES began as a distributor of DuPont products in the state of Maine.  Over a period of thirty-five years, NES grew and incorporated the entirety of New England within its distribution area.  In 2002, DuPont executives encouraged NES to take over the ailing Kilstrom Distributorship in Connecticut.  During these negotiations, DuPont executives promised to supply advertising for the Connecticut territory and a secure base of DuPont products.  Based on and because of the representations made by DuPont executives, NES acquired the Kilstrom distributorship.

During the course of the business relationship, DuPont established guidelines that their distributors were required to follow.  Specifically, DuPont dictated the prices at which distributors were to sell products and established terms of the businesses.  Parksite is one of DuPont's largest customers and distributors.  In late 2004, DuPont selected Parksite to participate in a "route to market" study and experiment that allegedly formed the basis for DuPont's termination of NES.

In 2005, DuPont lowered the prices at which distributors were to sell DuPont products.  In response, DuPont distributors formed the "G19" group to serve as the representative of all DuPont distributors in the United States, including NES.  The G19

4

appointed George Pattee, Parksite's CEO or President, as their representative in negotiations with DuPont. During this time, Parksite had access to NES' confidential sales information, including price lists. NES alleges that Parksite used its position as representative of the G19 to gain favor with DuPont and to collude with DuPont to take over the distribution area of NES.

In early 2006, DuPont gained access to NES' confidential business information. In February 2006, DuPont contacted NES to arrange a presentation with NES' twenty largest fabricators, who occupy an important role in NES' sale of DuPont products. DuPont represented to NES that the purpose of the presentation was to help NES and the fabricators improve the material flow and sale of goods. In addition, in March 2006, DuPont representatives contacted NES regarding a promotion for Corian products. DuPont represented that it required NES' customer list for the promotion. DuPont then requested the sales history for each NES customer, which NES provided for purposes of the promotion. NES alleges that DuPont requested and obtained NES' confidential business information after DuPont had already decided to terminate its business relationship with NES.

On April 4, 2006, DuPont notified NES that it was terminating the business relationship. DuPont set a termination period of thirty days, with an option to extend the termination period to sixty days. The notice also provided that Parksite would take over as DuPont's representative and distributor in New England.

### III.   DISCUSSION

On the basis of these facts, Plaintiff NES asserts claims against Defendants DuPont and Parksite. The Second Amended Complaint presses nineteen claims, sixteen of which are before the Court on this Motion to Dismiss.

#### A.   Choice of Law

At the threshold, the variety of claims pressed by Plaintiff presents complicated choice of law issues. A federal court sitting in diversity must apply the conflict of law rules of the state in which it sits, in this case, Maine. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); La Plante v. Am. Honda Motor Co., 27 F.3d 731, 741 (1st Cir. 1994). The state of Maine follows the Restatement (Second) of Conflicts of Laws in determining choice of law. Schroeder v. Rynel, Ltd., 720 A.2d 1164, 1166 (Me. 1998).

Notably, the Distribution Agreement includes a choice of law provision, which provides that Delaware law shall govern the Distribution Agreement and any rights or remedies arising from the contract. (Distribution Agreement at ¶ 8.B.) Maine will enforce a contractual choice of law provision pursuant to section 187(2) of the Restatement "unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . ." Restatement (Second) of Conflicts § 187(2) (1971); see also Schroeder, 720 A.2d at 1166.

A substantial relationship exists between Delaware and the parties and transactions because DuPont is incorporated in the state of Delaware. The Law Court has

recognized that a reasonable basis for a choice of law provision exists where the parties "choose a state's laws to govern because of that state's well-known and established body of law . . . ." Schroeder, 720 A.2d at 1166 (finding that the court would enforce a Delaware choice of law provision in an employment contract where the employer was incorporated in Delaware and the parties were aware of the well-established body of law in Delaware). Moreover, the Court will not refuse to enforce a choice of law provision as contrary to a fundamental policy of the state merely because the chosen law would yield a different result than Maine law. Id. at 1166-67. Therefore, the Court finds that the law of Delaware must govern the parties' contractual disputes.

Whether Delaware law must therefore govern the entirety of this dispute between the parties is not clear. The Court notes, however, that Maine has not explicitly endorsed the principle of depecage, under which a court applies the laws of different states to different substantive issues within a single case. Cf. La Plante v. Am. Honda Motor Co., 27 F.3d 731, 741-42 (1st Cir. 1994) (explaining the principle of depecage and applying depecage to Rhode Island tort law). Nonetheless, NES' Second Amended Complaint invokes the unfair trade practices statutes of at least four other states. In addition, the Second Amended Complaint asserts claims sounding in tort that would not necessarily be controlled by a contractual choice of law provision.

Assuming for the moment that the Court were to separately analyze the choice of law question for claims sounding in tort, Maine generally follows the Restatement (Second) of Conflict of Laws. Specifically, in tort disputes, Maine utilizes "the 'most significant contacts and relationships' approach." Flaherty v. Allstate Ins. Co., 822 A.2d 1159, 1166 (Me. 2003). Under the Restatement (Second) of Conflict of Laws, the Court

must consider both broad principles and principles specific to tort claims. The most significant contacts and relationships approach requires the Court to generally consider the following principles:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6 (1971) (hereinafter "the Section Six principles"). For claims sounding in tort, the Court should also consider the following contacts:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) Conflict of Laws § 145 (1971).

Consideration of the relevant principles point toward the application of either Maine or Delaware law. First, the parties maintained a contractual relationship that is controlled by Delaware law. Thus, under the Section Six principles, the parties justifiably expected that Delaware law would control. Other contacts, however, indicate the application of Maine law. The representations that form the basis for Plaintiff's injuries and allegations largely were made in Maine.[4] In addition, the parties' relationship originally was formed in Maine; NES began its distribution area in Maine and subsequently expanded to cover the entirety of New England. Thus, under the

---

[4] For example, the encouragement and promises of continued support in taking over the Kilstrom territory were made in Maine.

8

Section 145 principles, the parties' relationship arguably was centered in Maine. Finally, Plaintiff is incorporated within the state of Maine with a principal place of business in the City of Lewiston, while DuPont is incorporated in Delaware and Parksite is incorporated in Illinois.

In the context of deciding the pending motion, the Court need not make a definitive choice of law ruling that would become law of the case. Nonetheless, based on the above discussion, the only real choice of law options in this case appear to be Maine or Delaware. Aside from bald assertions that various state laws apply, the parties have provided no rationale for why the Court should step outside of Maine or Delaware law for any claim whether sounding in contract or tort.[5]

With this background choice of law discussion in mind, the Court turns its attention to the claims that do not appear able to cross the Rule 12(b)(6) hurdle.

### A.  The Connecticut Unfair Trade Practices Act

In Count II, NES alleges that the defendants violated Connecticut's Unfair Trade Practices Act ("CUTPA"). Conn. Gen. Stat. § 42-110b (2006). The applicability of CUTPA is determined by whether the Court would apply Connecticut law under the choice of law rules of the forum state, which in this case, is Maine. See Arturi v. U.S. Office Products Co. (In re U.S. Office Products Co. Sec. Litig.), 251 F.Supp. 2d 58, 68 (D.D.C. 2003); Travel Services Network, Inc. v. Presidential Fin. Corp. of Massachusetts, 959 F.Supp. 135, 146 (D.Conn. 1997); see also Bailey Employment Sys., Inc. v. Hahn, 655 F.2d 473, 475-76 (2nd Cir. 1981). As indicated above in the choice of law analysis, the Court finds no basis to apply Connecticut law to a tort claim arising out of this

---

[5] In future motions, the Court expects that the parties will address the choice of law questions outlined in this discussion or otherwise indicate their agreement as to what state law governs the claim at issue.

9

business relationship.[6]  Because the choice of law principles of the state of Maine do not indicate that Connecticut law should apply, the Court DISMISSES Count II.  See Arturi, 251 F.Supp. 2d at 70 (dismissing for failure to state a claim on which relief can be granted a claim based on the Connecticut Unfair Trade Practices Act because the law of the District of Columbia, and not the law of Connecticut, applied).

### B.     The Massachusetts Unfair Trade Practices Act.

Similarly, in Count III of the Second Amended Complaint, NES claims a violation of Massachusetts Unfair Trade Practices Act ("93A"), Mass. Gen. L. ch. § 93A (2006).  DuPont asserts that in accordance with Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems, Co., 986 F.2d 607 (1st Cir. 1993), Plaintiff's 93A claim is barred by the choice of law provision in the Distribution Agreement.  In Northeast Data Systems, Inc., the First Circuit stated that where a 93A claim amounts to little more than an "embroidered 'breach of contract' claim[]," a choice of law provision within a contract can act to preclude the application of the Massachusetts Unfair Trade Practices Act.  Id. at 609.  Further, while 93A claims may sound in tort, the First Circuit has held that a 93A claim is not necessarily a tort.  See id. at 610.  In support of Count III, Plaintiff asserts that "DuPont's sudden and arbitrary termination of NES' franchise in Massachusetts without cause is unfair and improper and has caused and will continue to cause substantial injury to NES and to consumers."  (Second Am. Compl. at ¶ 68.)

As in Northeast Data Systems, Inc., NES' claim lies within the scope of the Distribution Agreement.  The gravamen of NES' claim is that DuPont unfairly terminated the business relationship, which is essentially a breach of contract claim governed by the

---

[6] Courts have characterized CUPTA claims as sounding in tort. See, e.g., Bailey Employment Sys., Inc. v. Hahn, 655 F.2d 473, 475-76 (2d Cir. 1981); Arturi v. U.S. Office Products Co. (In re U.S. Office Products Co. Sec. Litig.), 251 F.Supp. 2d 58, 68 (D.D.C. 2003).

Delaware choice of law provision in the Distribution Agreement.[7]  See id. at 609 (stating that the claims of the plaintiff were truly contractual claims governed by the choice of law provision in the contract where plaintiff alleged that defendant acted willfully or knowingly or with a bad motive in breaching the contract by "(1) failing 'to provide' proper 'field service and support;' (2) failing to deliver goods when and as promised; (3) selling goods outside the 'sole distributorship' without paying commissions; and (4) wrongfully terminating the contract").  Thus, Plaintiff cannot state a claim under 93A, and the Court DISMISSES Count III.

### C.     The New Hampshire Unfair Trade Practices Act

In Count IV of the Second Amended Complaint, NES asserts a violation of the New Hampshire Consumer Protection Act.  N.H. Rev. Stat. § 358-A:2 (2006).  Although the New Hampshire Supreme Court has declined to decide whether a contractual choice of law provision can act to preclude application of the New Hampshire Consumer Protection Act, Hobin v. Coldwell Banker Residential Affiliates, Inc., 744 A.2d 1134, 1140 (N.H. 2000), this Court finds the reasoning of Northeast Data Systems, Inc. likewise applicable to the fourth count.  See Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d 607 (1st Cir. 1993). Through the contractual choice of law provision in the Distribution Agreement, the parties intended for Delaware law to apply to claims arising from the contract, including any claim of unfair trade practices.  Therefore, the contractual choice of law provision militates against the application of New Hampshire's Unfair Trade Practices Act, and the Court DISMISSES Count IV.

---

[7] This is distinguishable from a claim based on the fraudulent formation of the contract, which cannot be governed by the choice of law provision in a contract. See Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d 607, 611 (1st Cir. 1993).

11

### D. The Vermont Consumer Fraud Act

In Count V, Plaintiff alleges a violation of Vt. Stat. Ann. tit. 9, § 2451 et seq. (2006). This citation invokes the Vermont Consumer Fraud Act.[8] The Vermont Consumer Fraud Act prohibits "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." By its own terms for the Act to apply, the plaintiff must be a consumer. The Act defines a consumer as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services *not for resale in the ordinary course of his or her trade or business* but for his or her use or benefit . . . ." Vt. Stat. Ann. tit. 9, § 2451a. (2006) Both the Act and the Supreme Court of Vermont have made clear that a person (or business) who purchases goods for resale is not a member of the class protected by the statute. See id.; Poulin v. Ford Motor Co., 513 A.2d 1168, 1171 (Vt. 1986) (stating that "[t]he issue is whether the plaintiff bought the car to resell in the ordinary course of his business.") Here, because NES purchased DuPont products for the purpose of resale, NES cannot invoke the protections of the statute.[9] For this reason, the Court DISMISSES Count V.

### E. Unconscionability

Defendants assert in the Motion to Dismiss that NES fails to state a claim of unconscionability under either Maine or Delaware law. Because a claim of unconscionability evaluates whether the clauses of a contract are so one-sided as to "shock the conscience" or are such that no fair person would accept, the claim resounds

---

[8] In the Second Amended Complaint, NES incorrectly refers to the statute as the Vermont Unfair Trade Practices Act.

[9] As NES states, "DuPont's products represented approximately 75 percent of NES' sales." (Second Am. Compl. at ¶ 8.)

in contract and is therefore subject to the contractual choice of Delaware law.[10] Tulowitzki v. Atlantic Richfield Co., 396 A.2d 956, 960 (Del. 1978) ("[A] contract is unconscionable if it is such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other.").

Under Delaware law, in order to find unconscionability, "there must be an absence of meaningful choice and contract terms unreasonably favorable to one of the parties. Superior bargaining power alone without the element of unreasonableness does not permit a finding of unconscionability or unfairness." Tulowitzki, 396 A.2d at 960. The courts have recognized that bargaining power between parties is rarely equal. See Progressive Int'l Corp. v. E.I. du Pont de Nemours & Co., 2002 Del. Ch. LEXIS 91, *37 (Del. Ch. 2002). Furthermore, the courts have been hesitant to apply the doctrine in favor of sophisticated business corporations. Id.

In the case at hand, NES is a corporation with a thirty-five year history of business with DuPont. Thus, NES is a sophisticated corporation able to evaluate and intelligently enter a contract. See id. Although NES alleges that DuPont had both grossly disproportionate bargaining power and all of the bargaining power, a mere disparity of bargaining power is not sufficient to state a claim of unconscionability.[11] Tulowitzki, 396 A.2d at 960. Further, even if the contract favored DuPont, NES still had the decision to conduct business with DuPont. Just as DuPont exercised the termination

---

[10] The Court notes that Maine's test for unconscionability is substantially similar to Delaware. See Me. Rev. Stat. Ann. tit. 11, §2-302 cmt. 1 (2005) (stating that "[t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.) Thus, the Court would reach a similar result if it were to apply Maine law.

[11] Indeed, as the court stated in Progressive International Corp., "at most, Progressive has merely suggested that it might have wielded less bargaining power than DuPont, in the sense that its desire to deal with DuPont was greater than DuPont's desire to deal with it. This sort of unequal bargaining power does not support an unconscionability claim." 2002 Del. Ch. LEXIS 91, *37.

13

provision in the contract, so too could NES have exercised the decision to terminate its business relationship with DuPont and walk away. Therefore, because the contract terms were not unreasonably favorable to one side and NES maintained the meaningful choice to terminate the business relationship, the Court finds that NES has failed to state a claim for unconscionability. According, the Court DISMISSES Count XVI.

While some of the Defendants' remaining arguments may ultimately have merit, the Court concludes that these arguments are more appropriately evaluated at summary judgment, after there has been an opportunity for further factual development. At this stage, the Court cannot conclude that Plaintiff can prove no set of facts that would entitle it to relief on its remaining claims.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Defendants' Motion to Dismiss (Docket #s 44 & 49). It GRANTS the Motion to Dismiss Counts II, III, IV, V, and XVI and DENIES the Motion to Dismiss in all other respects. Therefore, the Court ORDERS that Counts II, III, IV, V and XVI be and hereby are DISMISSED with prejudice.

**SO ORDERED.**

/s/ George Z. Singal
Chief United States District Judge

Dated at Portland, Maine, this 20th day of October, 2006.