## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| NEW ENGLAND SURFACES<br>d/b/a DION DISTRIBUTORS, INC.   ) ) ) | |
|     Plaintiff,     ) ) | |
| v.     ) ) | Docket No. 06-cv-89-P-S |
| E.I. DU PONT DE NEMOURS<br>AND COMPANY d/b/a DUPONT<br>and PARKSITE, INC.   ) ) ) ) | |
|     Defendants.     ) ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT
## [REDACTED PUBLIC VERSION][1]

This case arises out of the termination of a business relationship between Defendant E.I. Du Pont de Nemours and Company ("DuPont") and Plaintiff New England Surfaces ("NES").[2] NES was the New England distributor of DuPont manufactured products for over thirty-five years. DuPont terminated the business relationship in April of 2006, and Defendant Parksite, Inc. ("Parksite"), a sales and distribution company based in Illinois, became the Sales Affiliate for DuPont in the New England area.

---

[1]     Pursuant to the Protective Order issued by this Court, portions of the Order on Motions for Summary Judgment have been redacted. (Docket # 172.) Furthermore, New England Surfaces and Parksite, Inc. are parties to a Confidentiality Agreement, which was entered into as of October 30, 2002. In its Motion for Summary Judgment, Parksite, Inc. refers to matters that come within the purview of the Confidentiality Agreement. Therefore, the Court will grant Defendant Parksite, Inc.'s Motion for Sealing of Documents. (Docket # 114.)

[2]     Throughout NES' thirty-five year history, the company underwent several name changes. For the sake of clarity, the Court will refer to the company as NES.

On August 29, 2006, NES filed a second amended complaint asserting nineteen claims against DuPont and nine claims against Parksite.  (Docket # 65.)  Specifically, the second amended complaint asserts causes of action against DuPont for violation of the Connecticut Franchise Act (Count I), Connecticut Unfair Trade Practices Act (Count II), Massachusetts Unfair Trade Practices Act (Count III), New Hampshire Consumer Protection Act (Count IV), Vermont Unfair Trade Practices Act (Count V), fraud and misrepresentation (Count VI), negligent misrepresentation (Count VII), breach of fiduciary duty (Count VIII), breach of fiduciary duty (Count IX), aiding and abetting tortious conduct (Count X), promissory estoppel (Count XI), breach of the covenant of good faith and fair dealing (Count XII), tortious interference with contractual rights and prospective economic interests (Count XIII), breach of contract (Count XIV), unreasonable termination of distribution agreements (Count XV), unconscionability (Count XVI), misappropriation of confidential information (Count XVII), violation of Maine Antitrust Statute (Count XVIII) and violation of Maine Unfair Sales Act (Count XIX).

The second amended complaint asserts causes of action against Parksite for violation of the Connecticut Unfair Trade Practices Act (Count II), Massachusetts Unfair Trade Practices Act (Count III), New Hampshire Consumer Protection Act (Count IV), Vermont Unfair Trade Practices Act (Count V), breach of fiduciary duty (Count IX), aiding and abetting tortious conduct (Count X), tortious interference with contractual rights and prospective economic interests (Count XIII), misappropriation of confidential information (Count XVII) and violation of Maine Antitrust Statute (Count XVIII).  On

October 20, 2006, the Court issued an Order on Motion to Dismiss, dismissing Counts II, III, IV, V and XVI of the second amended complaint.  (Docket # 71.)

Before the Court are Defendant DuPont's Motion for Summary Judgment with Incorporated Memorandum of Law (Docket # 109) and Defendant Parksite's Redacted Motion for Summary Judgment and Incorporated Memorandum of Law (Docket # 112).[3] Through these Motions, Defendants DuPont and Parksite seek summary judgment on all remaining counts alleged by NES.[4]  After reviewing the parties' submissions, the Court GRANTS IN PART and DENIES IN PART the Motions.

## I.      BACKGROUND

### A.      DuPont

DuPont manufactures the solid surfaces products Corian®, Zodiaq® and Simplicity ™ ("surface products"), which are used in the fabrication of countertops and a variety of other items used in kitchens, baths and other installations.  (Defendant E.I DuPont de Nemours and Company's Statement of Undisputed Material Facts ("DuPont's SMF") (Docket # 110) ¶ 1.)  For more than thirty years, DuPont has contracted with distributors, and more recently, a Regional Sales Office in New England, to market and distribute its products within the United States.   (Id.)  Distributors, in turn, sell the products to fabricators and retailers.[5]   (Id.)  Fabricators shape and make the DuPont products into countertops and other products.  (Id.)  Fabricators then sell finished

---

[3]      Also before the Court is a Motion of Defendant E.I. Du Pont de Nemours and Company for Oral Argument on its Motion for Summary Judgment.  (Docket # 125.)  Because the Court is able to resolve the Motion on the parties' submissions, the request for oral argument will be DENIED.

[4]      In Plaintiff New England Surfaces' Memorandum of Law in Opposition to the Motions for Summary Judgment of Defendants DuPont and Parksite ("Memorandum of Law in Opposition"), Plaintiff withdraws its claims for violation of the Maine antitrust statute (Count XVIII) and the Maine Unfair Sales Act (Count XIX).  (Docket # 178 at 47 n.28.)

[5]      Plaintiff's qualification has been incorporated.

products to retailers, builders, business owners and individual customers.  (Id.)  Retailers purchase products and resell them to consumers and others.  (Id.)

DuPont requires that all fabricators who create products using DuPont products enter into a standard form DuPont Certified Fabricator/Installer Agreement with DuPont. (DuPont's SMF ¶ 2.)  The Fabricator Agreements require that the fabricators register each residential Corian® installation with DuPont by completing the warranty registration cards and returning them to the distributor for processing.  (DuPont's SMF ¶ 3; Plaintiff's SMF ¶ 3.)  NES choose, trained and qualified the New England fabricators, who were NES customers that construct and install DuPont surface products.  (Plaintiff New England Surfaces d/b/a Dion Distributors, Inc.'s Response to Defendant DuPont's Statement of Material Facts and Statements of Additional Facts ("Plaintiff's SMF") (Docket # 176) ¶ 2.)

DuPont requires that retailers of DuPont products enter into a standard form DuPont Authorized Retailer Agreement.  (DuPont's SMF ¶ 4.)  In the case of Corian®, the agreement provides that each retailer is eligible to be listed on the DuPont Corian® website retailer locator and other leading remodeling websites authorized by DuPont. (Id.)  The DuPont retailer agreements require that retailers work with Certified Fabricators/Installers to enter warranty card information into the DuPont website www.warrantycards.com.  (Id. ¶ 5.)

Since at least the early 1980s, DuPont has maintained several databases, including the above website, which contain information about Certified Fabricators/Installers and Authorized Retailers in each Geographical Marketing Area ("GMA") in which DuPont's products are sold.  (Id. ¶ 6.)  The DuPont databases contain the names, addresses and

other information about retailers and fabricators.  (Id. ¶ 7.)  The information in the databases has been submitted to DuPont by distributors, fabricators, retailers, consumers, from leads developed by DuPont and others at trade shows, from consumer visits to public DuPont websites and from sales information reported by fabricators and distributors.  (Id.)  Distributors have access to certain DuPont databases, including databases known as corianenterprise.com and salesforce.com.  (DuPont's SMF ¶ 8.)  The databases to which distributors have access, however, do not contain information regarding other distributor's customer lists, and internal DuPont websites offer limited access to the public and distributors.  (Plaintiff's SMF ¶¶ 6, 8.)  Authorized retailers in the New England GMA with which NES did business were known to the public through these websites.  (Id. ¶ 10; DuPont's SMF ¶ 10.)  Nonetheless, some of the data collected by DuPont and maintained in the DuPont databases was available to the public on its website.  (DuPont's SMF ¶ 9.)  The information available to the public did not include sales data such as sales volume or rankings of distributors.  (Plaintiff's SMF ¶ 9.)

**B.    New England Surfaces**

New England Surfaces, based in Lewiston, Maine, was an authorized distributor of DuPont solid surface products for over thirty-five years.  (Plaintiff's SMF ¶ 118.)  At the time DuPont terminated its distributorship, NES was the New England distributor of the three DuPont surface products.  (Id. at ¶ 119.)

In April of 2006, DuPont surface products accounted for approximately 75% of NES' business, and DuPont was aware of this.  (Id. ¶ 121.)  Corian® was the dominant trade name supporting NES' business and was featured on NES' trucks, business cards, apparel and marketing materials.  (Id. ¶ 122.)  In addition to DuPont surface products,

NES distributed cabinets, decorative hardware and flooring products, which comprised the remainder of NES' business.  (Id. ¶ 124.)  DuPont discouraged NES from carrying competing product lines.  (Id. ¶ 176.)  At DuPont's urging, NES reduced its offerings of non-competing products from fifty product lines in 2000 to fourteen product offerings in 2004 so that its employees could focus on DuPont products.  (Plaintiff's SMF ¶ 176.)

At the time of the termination, Robert Dion, Jr. ("Dion") was the CEP and sole shareholder of NES.  (Id. ¶ 125.)  In 1998, Dion purchased the company from his father, Robert Dion, Sr.  (Id. ¶ 126.)  In 2000, NES merged with Winde-McCormick, a Rhode Island based authorized DuPont surface products distributor.  (Id. ¶ 127.)  DuPont supported NES' merger with Winde-McCormick, which resulted in NES' expansion into Rhode Island, Massachusetts and part of Connecticut.  (Id. ¶ 128.)

On or about May 24, 2004, Dion and Ronald Winde traveled to Wilmington, Delaware to meet with the leaders of the DuPont surfaces business.  (DuPont's SMF ¶ 61.)  During that meeting, Dion and Winde advised DuPont that Dion intended to buy out the fifty percent ownership interest of Ronald Winde and members of his family in NES.  (Id. ¶ 62.)  DuPont was concerned that the increased debt load would mean that NES would be unable to grow the business and reinvest in it.  (Id. ¶ 67.)  In 2004, NES procured $4.5 million in financing from Citizens Bank, which was used to purchase all of Ronald Winde's shares, and thereby Dion became NES' sole shareholder.  (Plaintiff's SMF ¶¶ 132, 133; DuPont's SMF ¶ 68.)  Dion indicated, however, that the debt from the Winde buy-out did not adversely affect NES' ability to grow the business and reinvest in it.  (Plaintiff's SMF ¶ 67.)

## C.      The Agreements between DuPont and NES

Over the years, NES was asked to sign a number of different agreements with DuPont.  (Plaintiff's SMF ¶ 166.)  At any given time, different agreements were in place.[6]  (Id.)  There were, for example, separate written agreements for Corian®, Zodiaq® and Simplicity™.[7]  (Id. ¶ 167.)  DuPont repeatedly and over the course of many years emphasized to its distributors, including NES, the need for a relationship based on mutual aid, loyalty and trust.  (Id. ¶ 168.)

DuPont signed a written distributor agreement with NES for the distribution of Corian® products on August 11, 2000 ("2000 Agreement"), which was in effect until NES was terminated in 2006. [8]  (DuPont's SMF ¶¶ 18, 19.)  The preamble and paragraphs

---

[6]      Plaintiff's statement that no single agreement governed the relationship between the parties is a legal conclusion, the merits of which will be addressed below.

[7]      Plaintiff's statement that there were business plans, invoices and writings dealing with special DuPont promotions and sales plans is not supported by the record citation.  In addition, Local Rule 56 requires a pin citation to a portion of the record.  See, e.g., will not suffice.

[8]      In Plaintiff New England Surfaces d/b/a Dion Distributors, Inc.'s Response to Defendant DuPont's Statement of Material Facts and Statements of Additional Facts (Docket # 176), NES alleges that numerous statements of material fact by DuPont (¶¶ 16, 17, 20, 21, 23-36, 47, 48, 83-89, 91) should be stricken because Exhibits C through L and Exhibits O, N and BB have not been properly authenticated as required by Fed. R. Evid. 901, the exhibits constitute inadmissible hearsay pursuant to Fed. R. Evid. 801 and 802 and because the Wyman Affidavit does not satisfy the requirements of Fed. R. Civ. P. 56(e).  Notably, Plaintiff provides only bald assertions and fails to articulate specifically why the Court should exclude the documents.  Nonetheless, the Court will consider Plaintiff's objections.

Federal Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  For each document in question, the Affidavit of John C. Wyman provides that each document is a true and correct copy of the document that DuPont claims it to be and provides the date of each agreement and the parties to the agreement or a clear reference to the financial document.  The Court finds that this is sufficient authentication to satisfy Rule 901.

Federal Rule of Evidence 802 states that "[h]earsay is not admissible except as provided by these rules . . . ."  The contracts, however, are not hearsay.  The First Circuit has indicated that "[s]igned instruments such as wills, contracts, and promissory notes are writings that have independent legal significance, and are nonhearsay."  Florence Nightengale Nursing Servs., Inc. v. Paul Revere Life Ins. Co., 94-1754, 1995 U.S. App. LEXIS 17506, at *11 (1st Cir. July 19, 1995) (quoting Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527, 540 (5th Cir. 1994)).  In addition, the Federal Rules of Evidence explicitly provide an exception to the hearsay rules for business records.  Fed. R. Evid. 803(6).

1 through 9 of the 2000 Agreement are identical in all respects to the preamble and paragraphs 1 through 9 of the 1997 Agreement between DuPont and NES.  (Id. ¶ 20.) Dion was told that the contract, formed 26 years into the relationship, was "some boilerplate that Wilmington wants" by a person from DuPont.[9]  (Plaintiff's SMF ¶ 169.)

The 2000 Agreement and each of the agreements between DuPont and NES' predecessors[10] contained express provisions stating that either party could terminate the agreement upon 30 days' notice.  (DuPont's SMF ¶ 21.)  The 2000 Agreement stated that "either party may terminate this agreement with or without cause, upon at least thirty (30) days prior written notice."  (Id. ¶ 22.)  In 2000, DuPont and NES also entered into written distributor agreements for the distribution of two other surface products, Zodiaq® and Simplicity™.  (Id. ¶ 23.)  The Zodiaq® contract contained a termination provision identical to that contained in the 2000 Corian® Agreement, and the Simplicity™ contract explicitly stated: "The parties agree all of the terms and conditions, including rights of termination, of the Corian® Distributor Agreement, shall govern this Agreement . . . ." (Id. ¶ 24; Docket # 121-4 ¶ 1.)

The 1991, 1997 and 2000 Agreements contained provisions requiring the submission of NES' business plans to DuPont.  (Id. ¶ 30.)   NES, along with its

---

Rule 56(e) states: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Plaintiff provides only a bald assertion that the Affidavit of John C. Wyman fails to comply with Rule 56(e), despite the statement within the affidavit that "[t]his affidavit is based on my personal knowledge of the record in this action, as well as the parties' discovery responses and transcripts of depositions taken in this action."  (Affidavit of John C. Wyman (Docket # 117) ¶ 2.)  The Court will not endeavor on its own to determine any potential insufficiencies of the affidavit and instead finds that the affidavit complies with the requirement of Rule 56.

[9]      Notably, there is no indication of who made these statements.

[10]      DuPont had written distributor agreements for the distribution of DuPont products with each of NES' predecessor entities in which Dion or his parents held interests or was involved.  (DuPont's SMF ¶ 16.)

predecessors, and DuPont agreed in the 1991, 1997 and 2000 Agreements that: "DuPont will judge the performance of [NES] based upon, without limitation, compliance with the Business Plan, achievement of target segment market share in GMA and overall growth in Corian purchases."  (Id. ¶ 31.)  The 2000 Agreement, however, provided that "before the commencement of every succeeding year hereunder DuPont and [NES] will agree in writing to a new one (1) and three (3) year Business Plan."  (DuPont's SMF ¶ 173.)  Until 2004, NES prepared its own business plans for DuPont's review and approval. (Plaintiff's SMF ¶ 172.)  Starting in 2004, DuPont drafted and prepared business plans and presented them to NES.  (Id. ¶ 173.)  As part of the process of approving NES' business plans for the year 2005, DuPont indicated to NES what its end number needed to be.  (Plaintiff's SMF ¶ 174.)  DuPont would not move the goals that it set for distributors, and NES perceived that it had to sign onto pricing agreements.  (Id. ¶ 171.)  DuPont reviewed NES' financial statements at least annually and required that DuPont approve all significant changes to NES' ownership.  (Id. ¶ 175.)

The 1997 and 2000 Agreements contained a clause that stated: "All understandings, representations, warranties and agreements, if any, heretofore existing between DUPONT and [NEW ENGLAND SURFACES] regarding the subject matter hereof are merged into this Agreement, including the Schedule attached hereto, which full [sic] and completely express the entire understanding of the parties with respect to the [sic] their relationship."  (DuPont's SMF ¶ 32.)

The 1997 and 2000 Agreements also stated that the parties entered the Agreement "freely, intelligently, and voluntarily" with "nether [sic] party relying upon any statement or representation not contained in this Agreement or the Schedules attached hereto."  (Id.

¶ 33.)  The 1997 and 2000 Agreements additionally provided that they "shall not be amended or modified orally, by usage of trade, or course of dealing and no amendment or modification shall be of any force or effect unless contained in a writing signed by both parties . . . ."[11]  (Id. ¶ 34.)

In addition to the above provisions, the 1997 and 2000 Agreements explicitly limited DuPont's liability and damages in the event that it terminated the distributor relationship:

> "[e]ach party has considered the possibility of expenditures necessary in preparing for the performance of this Agreement and each agrees that neither of them shall be liable to the other for any such expenditures or for damages or losses incident thereto.  Moreover, DuPont shall have no liability of any kind or nature whatsoever (including without limitation, indirect, consequential, special, incidental or punitive damages) to [NES] for terminating this Agreement in accordance with the terms thereof."[12]

(Id. ¶ 35.)   In addition, the 1997 and 2000 Agreements expressly limited DuPont's liability for any communications relating to the termination: "DuPont shall have no liability of any kind whatsoever . . . to [NES] for DuPont's communications . . . with past, present or prospective purchasers or users of Products when such communications pertain to termination of [NES]."[13]  (Id. ¶ 36.)

---

[11]     Plaintiff claims to qualify the statement in DuPont's paragraph 33 by stating that "[t]he Agreements speak for themselves."  (Plaintiff's SMF ¶ 34.)  Local Rule 56 requires a party responding to a statement of material facts to admit, deny or qualify the underlying statement.  See Loc. R. 56(c)-(d).  The concept of 'qualification' presupposes that the underlying statement is accurate but in some manner incomplete, perhaps even misleading, in the absence of additional information.  Except to the extent that a party, in qualifying a statement, has expressly controverted all or a portion of the underlying statement, it has been deemed admitted.

[12]     Plaintiff's response is to deny.  The response, however, contains only argumentation ("[t]he provision DuPont cites in this paragraph does not foreclose any of NES' claims in this matter because . . . ."), fails to provide record citation that contradicts the facts set forth in the paragraph, and is therefore admitted.  See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 260 (D. Me. 2004).

[13]     See supra note 12.

### D.   NES Acquires the Kilstrom Distributorship

In 2002, NES acquired Kilstrom Distribution, Inc. ("Kilstrom") a distributor of DuPont surfaces products with a GMA comprising most of Connecticut and most of Massachusetts.  (DuPont's SMF ¶ 40.)  Before the acquisition, John Charamella, the Regional Corian® Sales Manager for DuPont, approached NES and encouraged it to buy Kilstrom.  (Plaintiff's SMF ¶ 129.)  Bill Flemins, the National Distribution Manager for DuPont, Mike Salzberg, the North American DuPont Business Manager, and Mike McDonnell, the Eastern Regional Sales Manager for DuPont, told NES that DuPont would support NES' acquisition of the Kilstrom Territory.  (Id.)  Based on these assurances, NES acquired Kilstrom, its Connecticut territory and customers and leased an office and warehouse facility in Wallingford, Connecticut for $6.35 million.  (Id. ¶ 130.)  Kilstrom's sales goals were added to NES', which NES had trouble meeting.  (Id.)  NES was made more vulnerable financially by incurring the debt.  (Id.)

By letter agreement dated March 1, 2002, between NES and DuPont, the 2000 Agreement was amended solely to expand NES' GMA to include the former Kilstrom GMA.  (DuPont's SMF ¶ 41.)  All of the other provisions in the 2000 Agreement remained unmodified.  (Id. ¶ 42.)

None of the agreements between NES and DuPont required that NES maintain a place of business in Connecticut.  (Id. ¶ 43.)  Connecticut is referenced in the amended Agreement because portions of Connecticut and portions of Massachusetts were designated as part of the GMA to be serviced by NES.  (Id. ¶ 44.)  There was little, if any, communication between Dion and DuPont regarding the plans in Connecticut moving forward from the acquisition.  (Id. ¶ 44, 45.)  Dion testified at his deposition that the lack

of communication was because NES was operating "at the status quo," and how NES would conduct distribution in Connecticut was not an issue of contention. (Plaintiff's SMF ¶ 45, 46.) NES believed that it was "maintaining the status quo" by continuing to maintain a place of business in Connecticut, as Kilstrom had. (Id. ¶¶ 43, 45, 46.)

NES was represented by counsel during the acquisition of Kilstrom and was aware of the financial obligations imposed by the deal. (DuPont's SMF ¶ 48.) Dion, as corporate designee of NES, was asked what representations were made to him by DuPont in connection with the acquisition of Kilstrom. (Id. ¶ 49.) Dion testified that two DuPont employees, Bill Fleming and John Charamella, told NES that DuPont would provide "local advertising" support to NES after the acquisition.[14] (Id. ¶ 50.) Dion clarified that he thought "local advertising" support meant that DuPont would provide funding for local advertising to NES after the acquisition. (Id. ¶ 51.) Dion further testified regarding what local advertising meant: "It just means that there will be funds available in your marketplace over and above what normally would be deployed to that market area. More bucks is what it amounts to." (Id. ¶ 52.) Dion also testified that there was no discussion regarding how long the funds would be made available or precisely how much money DuPont would extend to NES in local advertising funds. (Id. ¶¶ 52, 53.)

E.      **Critical Review Status**

In the fall of 2003, NES was placed on "Critical Review" by DuPont.[15] (DuPont's SMF ¶ 56.) On November 20, 2003, DuPont met with representatives of NES

---

[14]       This incorporates Plaintiff's qualifications to paragraphs 51 through 53.

[15]       Local Rule 56 requires a party responding to a statement of material facts to admit, deny or qualify the underlying statement. See Loc. R. 56(c)-(d). The concept of 'qualification' presupposes that the underlying statement is accurate but in some manner incomplete, perhaps even misleading, in the absence of additional information. Except to the extent that a party, in qualifying a statement, has expressly controverted all or a portion of the underlying statement, it has been deemed admitted.

to discuss NES' "performance as an Authorized Distributor for DuPont Corian and the steps . . . that New England Surfaces, Inc., will take to make progress towards achieving performance goals, and to grow purchases and increase resale of DuPont Corian products." (Id.) Dion was told that the Critical Review process was a formality, and that the Critical Review letter was "a form letter" that a number of other DuPont distributors had also received.[16]  (Plaintiff's SMF ¶ 56.)  Nonetheless, at his deposition, Dion indicated that he knew of a prior DuPont distributor, KBQ in Massachusetts, that was terminated for underperformance.  (DuPont's SMF ¶¶ 37, 38.)  Dion was approached by DuPont prior to KBQ's termination to take over the KBQ territory.  (Id.)

The December 5, 2003 letter from DuPont to NES required NES to submit a "Corrective Action Plan" within thirty days, "[i]dentify[ing] specific action items . . . to correct the performance deficit" and "provid[ing] monthly updated purchase forecasts." (Id. ¶ 57.)  The December 2003 letter from DuPont ended with the following statement:

> The steps described above including the acceptance and implementation of a Corrective Action Plan, do not alter or supersede any portion of the existing Corian Distribution Agreement, including: (1) DuPont's right to terminate the agreement with or without cause; (2) Distributor's right to terminate the agreement with or without cause; (3) DuPont's right to appoint additional representatives within all or part of the Territory.

(Id. ¶ 58.)  On December 23, 2003, NES submitted a Corrective Action Plan to DuPont. (Id. ¶ 59.)  On April 26, 2004, DuPont sent another Critical Review letter to NES, indicating that NES "remains on Critical Review," noting that NES was still not meeting its objectives and that DuPont was looking to NES "to show a sustainable turnaround in performance."  (Id. ¶ 60.)

---

[16]     Notably, neither the affidavit nor Plaintiff's SMF provide who at DuPont communicated this to Dion.

In April 2005, DuPont summoned the principals of NES to a meeting with the leaders of the DuPont surfaces business.  (DuPont's SMF ¶ 69.)  Dion and Charles Trapani, the recently appointed President of NES, attended the April 28, 2005 meeting with DuPont, where they were told that NES remained on Critical Review.  (Id. ¶¶ 70, 71.)  DuPont questioned how NES was going to meet its sales goals and stated that NES was not currently meeting those goals.  (Id.)  NES indicated that it would do everything it could to meet the goals.  (Id.; Plaintiff's SMF ¶ 71.)

On May 4, 2005, DuPont sent another letter to NES, which further emphasized that NES was "falling considerably short of the business plan and objectives" and required that NES develop and submit to DuPont an "urgent plan of action to immediately reverse your performance to meet expectations."  (DuPont's SMF ¶ 72.)  The letter stated that DuPont "will accordingly not hesitate to take any action permitted under Distributor agreements should performance not significantly improve."  (Id. ¶ 73.)  On May 11, 2005, NES responded to DuPont's May 4, 2005, letter, stating that NES "confirm[ed] our understanding of the severity of the situation" and NES "had a 50% confidence level" that it could achieve the originally stated goals for 2005, and a "90% confidence level" that it could achieve purchases that were 9.7% below goal and sales that were 4.7% below goal.  (Id. ¶ 75.)

On September 29, 2005, DuPont sent another Critical Review letter to NES, stating that "[o]verall performance of [NES] continues to fall below goals and expectations" and that NES' purchases are 23% below goal year to date, and that NES' sales were 12% below goal year to date.  (Id. ¶ 76.)  It was around this time that DuPont began contemplating terminating NES.  (Plaintiff's SMF ¶ 76.)  On October 27, 2005,

NES responded to the September 29, 2005 Critical Review letter stating: "We acknowledge and understand that on a year-to-date basis NES is still behind its improved growth goal as you indicate in your letter . . . . NES is still not pleased with its progress and remains committed to doing its part in turning things around."  (DuPont's SMF ¶ 77.)

On January 27, 2006, DuPont sent another Critical Review letter to NES, stating: "[t]he results are disappointing and well below expectations and goals . . . . DuPont is looking for [NES] to show a sustainable turnaround in performance . . . . [t]he above, including the implementation of corrective action plans, do not alter or supersede any portion of the existing Corian Distributor Agreement."  (Id. ¶ 78.)  The January 27, 2006 letter also summarized in numeric terms NES' failures to meet DuPont's goals over the past year, as well as NES' failures to meet its own forecasts, which it had submitted to DuPont on May 11, 2005.[17]  (Id. ¶ 79.)  **[REDACTED]**  On February 21, 2006, NES responded to DuPont's January 27, 2006 Critical Review letter, stating that NES was "also not satisfied with the progress of Corian sales to date . . . ."  (DuPont's SMF ¶ 80.)

## G.    The Customer Lists

On or about February 13, 2006, DuPont invited all distributors of Corian® products to participate in a marketing promotion called "Get a Cool Deal on Corian." (DuPont's SMF ¶ 99.)  Each distributor that wished to participate in the program was required to submit certain data about the retailers the distributors intended to target in the promotion, including: (i) the DuPont Retailer number associated with the retailer; (ii) the name, address, telephone number and contact name for the retailer, and (iii) the amount

---

[17]      NES achieved only 88% of its original sales goal and 83% of its original performance goal. (DuPont's SMF ¶ 79.)  NES achieved only 86% of its own forecasted sales and only 82% of its own forecasted purchases.  (Id.)  Overall from 2004 to 2005, NES' purchases fell by 10% and sales fell by 16%. (Id.)

of sales that the distributor had made to the retailer in 2005.  (<u>Id.</u> ¶ 100.)  The sales data requested by DuPont was only for the year 2005 and was for the "Magna" color series. (<u>Id.</u> ¶101.)

In March 2006, DuPont's John Charamella requested that NES' Lew Paine provide a more accurate customer list with sales figures for the "Get a Cool Deal on Corian" promotion, stating that NES' participation in the promotion would be approved once the customer list information was received.  (Plaintiff's SMF ¶ 178.)  Prior to the "Cool Deal" promotion, DuPont had never requested that NES provide DuPont with its complete customer list or individual customers' sales data.  (<u>Id.</u> ¶ 179.)  Although DuPont's promotions were characterized as voluntary, NES felt compelled to participate. (<u>Id.</u> ¶ 102.)  DuPont could not have come up with the customer list on its own, as it included many non-authorized dealers of Corian® and sales data to which DuPont was not privy.  (<u>Id.</u> ¶ 180.)  The sales data from NES requested for the "Cool Deal" promotion contained information that DuPont did not otherwise have in its databases.  (<u>Id.</u> ¶ 181.)

On March 20, 2006, Lew Pain forwarded the requested customer list and data to John Charamella.  (<u>Id.</u> ¶ 182.)  DuPont, by virtue of the databases described above, already had most of the data requested in the "Cool Deal" promotion for each retailer identified by NES, with the exception of the sales data.  (DuPont's SMF ¶ 104.)

DuPont claims that it needed the data about sales because the stated goal of the promotion was to achieve a 20% increase in each retailer's Corian® sales.  (<u>Id.</u> ¶ 105.)  In an effort to track results against the goal, DuPont requested the sales data from each participating retailer.  (<u>Id.</u>)  **[REDACTED]**

There are no markings on the customer list stating that it is a confidential document or to be treated as confidential. (Defendant Parksite, Inc.'s Statement of Material Facts in Support of its Motion for Summary Judgment ("Parksite's SMF") (Docket # 119) ¶ 41.) NES never sought a commitment from DuPont of restrictions on the use of the information in the list. (Id. ¶ 42.) NES did not have any of its employees sign employment agreements, confidentiality agreements or non-compete agreements. (Id. ¶ 49.)

**F.      DuPont Delivers Notices of Termination**

On April 4, 2006, DuPont hand delivered notices of termination of NES' Distributor Agreements for Corian®, Zodiaq® and Simplicity™ products. (DuPont's SMF ¶ 81.) The notices provided that for the first thirty days NES would continue being the distributor of DuPont products in its GMA, but that upon expiration of the initial thirty days DuPont would commence sales within NES' territory, and that NES' termination would be effective upon expiration of the second thirty day period, on June 4, 2006. (Plaintiff's SMF ¶ 191.)

DuPont decided not to inform NES of its termination prior to delivering the notice of termination, and was concerned that NES' sales of DuPont surface products would be impacted, particularly if NES began distributing competing products. (Plaintiff's SMF ¶ 186.) By e-mail stream dated April 12-13, 2005, between DuPont's Tom Kearns, Mick MacDonnell, John Charamella, John Groves, Rand Mendez, Michael Gilmore and Patrick Owens, DuPont personnel wrote: "[NES] may have reached the point of no return and our market presence in New England is suffering." (Plaintiff's SMF ¶ 183; DuPont's SMF ¶ 183.) In addition, they wrote: "there appears to be minimal risk in terminating

[NES] and 'proposing' Parksite assume the GMA" and that "[r]ealizing a Parksite acquisition may take up to a year to consummate . . . . Maybe we could negotiate the deal in principle, agree on the evaluation, etc.  Then . . . while doing diligence and finishing off the acquisition . . . . We could terminate NES.  Would need to check legal implications."  (Plaintiff's SMF ¶ 184.)

NES requested an additional 120 days to effect a transition to another surface product, but DuPont did not grant its request.  (Id. ¶ 197.)  NES attempted to acquire alternative surface products and began distributing Meganite, but NES needed additional time to transition its business.  (Id. ¶ 198.)  DuPont and Parksite discouraged fabricators interested in supporting NES' Meganite business, stating in an e-mail: "We need to be clear to our customers that any investment they provide the Meganite start-up will be viewed as supporting Corian® replacement by a competitive product."  (Id. ¶ 199.)

In December 2006, NES ceased doing business.  (Id. ¶ 200.)  NES was forced to vacate its facilities, thereby incurring liabilities to its landlords.  (Id. ¶ 201.)  NES was forced to self-liquidate, in an effort to pay off its creditors.  (Plaintiff's SMF ¶ 202.)  Among other debts and liabilities, NES continues to owe its lenders $3.6 million plus interest, plus legal fees.  (Id. ¶ 203.)  In the six months since NES was terminated, Parksite and DuPont have generated sales of $15,440,789 million in surface products in the New England GMA.  (Id. ¶ 204.)

G.      **Parksite**

After the termination, DuPont announced "a new channel efficiency and alignment model for the marketing and sales promotion of its products which . . . uses a

demand creation provider instead of a distribution model . . . ."[18]  (DuPont's SMF ¶ 83.)
A new model called a "Regional Sales Office" was introduced.[19]  (Id. ¶ 84.)

DuPont appointed Parksite to be DuPont's "Sales Affiliate" for the Regional Sales
Office serving the New England GMA by written agreement dated March 29, 2006.  (Id.
¶ 85; Plaintiff's SMF ¶ 188.)[20]  The Sales Affiliate Agreement provides by its express
terms that it would be effective from the later of the date of final execution of the
Agreement and "following the termination by DuPont of its incumbent distributor in the
territory . . . ."  (Plaintiff's SMF ¶ 189.)  In addition, during 2005, DuPont and Parksite
had been engaged in discussions regarding the possibility of DuPont acquiring Parksite.
(Id. ¶ 92.)

Under the Sales Affiliate Agreement, Parksite is solely responsible to: "perform . .
. functions and activities . . . relating to the marketing, advertising and sales promotion of
DuPont Products . . . ."  (DuPont's SMF ¶ 86.)  Specifically, the Sales Affiliate
Agreement requires Parksite to: "represent, market and promote the use and sales of, to
solicit offers to purchase and transmit offers to sell, in connection with" DuPont Corian®
and DuPont Zodiaq® products.  (Id. ¶ 87.)  The Sales Affiliate Agreement requires
DuPont to, among other things, provide and manage product inventory, take orders for
products and deliver products to Parksite.  (Id. ¶ 89.)

DuPont did not select Parksite to be the Sales Affiliate until late January 2006.
(Id. ¶ 92.)  As of January 16, 2006, C.H. Briggs was DuPont's top choice to fill the role

---

[18]    Plaintiff attempts to qualify this statement.  Plaintiff's qualification, however, is not supported by
the record citation.

[19]    Plaintiff purports to deny the entirety of DuPont's SMF ¶ 84.  Plaintiff's denial, however, only
contradicts the first sentence.  The remainder is admitted.

[20]    Plaintiff purports to deny DuPont's SMF ¶ 85.  Nonetheless, Plaintiff's response is more
appropriately deemed a qualification and the Court treated it as such.

of Sales Affiliate for the New England GMA.  (Id. ¶ 93.)  C.H. Briggs was ultimately not selected because another distributor, Fessenden Hall, had terminated its distribution agreement with DuPont and DuPont asked C.H. Briggs to assume responsibility for the GMA previously served by Fessenden Hall.[21]  (Id. ¶ 94.)  Parksite was chosen from among three other candidates to be the Sales Affiliate.[22]  (DuPont's SMF ¶ 90.)  As stated in the Sales Affiliate Agreement, Parksite was chosen because "it has the skills, capability and expertise in the marketing, sales promotion, advertising development and increase of trade" in connection with DuPont's products.[23]  (Id. ¶ 91.)

On the date of the notice of NES' termination, DuPont transmitted a broadcast communication to fabricators, retailers and builders in the New England GMA, in which DuPont advised that NES was to be terminated and explained the new RSO model for servicing New England.  (Id. ¶ 95.)  The list of entities to which the communication was transmitted was developed using DuPont's databases, corianenterprise.com and salesforce.com.  (Id. ¶ 96.)  However, DuPont's public databases contained limited

---

[21]    Plaintiff asserts a qualification to DuPont's SMF ¶ 94.  Local Rule 56 requires a party opposing summary judgment to admit, deny or qualify each fact and "shall support each denial or qualification by a record citation as required by this rule."  Local Rule 56(c).  Local Rule 56(f) requires that "[a]n assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion.  The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment.  The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."  Id. at 56(f).  Plaintiff proffers an assertion followed by a "see, e.g.," citation to six separate exhibits totaling over fifty pages.  The citation contains not a single citation to a specific page or paragraph.  In accord with Local Rule 56, the Court declines to wade through the exhibits to locate support for the assertion.

[22]    The remainder of DuPont's SMF ¶ 90 is not supported by the record citation.  In addition, Plaintiff's qualification to DuPont's SMF ¶ 90 is identical to the qualification of DuPont's SMF ¶ 94.  The Court, again declines to wade through the exhibits, and notes that assertions that fail to comply with Local Rule 56 will not be considered by the Court.

[23]    Plaintiff's qualification to DuPont's SMF ¶ 91 is identical to the response to ¶ 94.  The Court, again declines to wade through the exhibits, and notes that assertions that fail to comply with Local Rule 56 will not be considered.

information about NES' fabricators and customers whom NES had identified and cultivated over the years. (Plaintiff's SMF ¶ 96.)

On the advice of counsel, DuPont waited for four hours, until 5 p.m. before it began communicating with NES' customers and fabricators about NES' termination. (Id. ¶ 192.) **[REDACTED]** The list of entities that DuPont and Parksite visited was developed using the two DuPont databases previously mentioned.

Some NES customers were told by agents of Defendants that NES was going out of business.[24] (Plaintiff's SMF ¶ 195.) During the initial thirty day period, DuPont representatives met with various NES customers. (Id. ¶ 196.) During those meetings, DuPont representatives informed the customers that following the initial thirty day period, the customers would need to contract with DuPont to receive DuPont materials.

**H.     The G-19**

**[REDACTED]** All members of the G-19, including Parksite and NES, executed a Mutual Confidentiality and Non-Disclosure Agreement (the "Confidentiality Agreement"). (Parksite's SMF ¶¶ 29.) **[REDACTED]**

**II.    STANDARD OF REVIEW**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "material fact" is one that has "the potential to affect the outcome of the suit under the

---

[24]     DuPont claims that the underlying statement is hearsay. Beyond this bald assertion, DuPont proffers no further analysis or citation. The court is not considering the statements for the truth that NES was going out of business, but for notice that was given to NES' customers.

applicable law."  Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants  summary judgment to the moving party."  In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## III.   DISCUSSION

Before turning to the substantive claims at issue in the Motions for Summary Judgment, the Court must address the threshold choice of law issue.  The parties to this case have agreed that Delaware law applies to the contract-based claims and that Maine law should apply to the tort-based claims.  Maine[25] has not explicitly endorsed the principle of depecage.  Cf. La Plante v. Am. Honda Motor Co., 27 F.3d 731, 741-42 (1st

---

[25]     A federal court sitting in diversity must apply the conflict of law rules of the state in which it sits, in this case, Maine.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941);  La Plante v. Am. Honda Motor Co., 27 F.3d 731, 741 (1st Cir. 1994).

Cir. 1994) (explaining the principle of depecage, under which a court applies the laws of different states to different substantive issues within a single case, and applying depecage to Rhode Island tort law); see also Collins v. Trius, Inc., 663 A.2d 570, 573 (Me. 1995) ("In applying the 'most significant contacts and relationships' test, it is necessary to isolate the issue, to identify the policies embraced in the laws in conflict, and finally to examine the contacts with the respective jurisdictions to determine which jurisdiction has a superior interest in having its policy or law applied."). Nonetheless, "[w]here the parties 'have reached a plausible agreement about what law governs, a federal court sitting in diversity jurisdiction is free to forgo independent inquiry and accept that agreement.'" First Marblehead Corp. v. House, 473 F.3d 1, 8 (1st Cir. 2006) (citing Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003)). Given the Delaware choice of law provision within the distribution agreements and the significant contact that the tort-based claims have with Maine, the Court finds the parties' agreement to be reasonable. Thus, the Court will follow the parties' agreement.

## A.    Breach of Contract & Unreasonable Termination of Distribution Agreements (Counts XIV & XV)

At the heart of this case lie the distributor agreements between DuPont and NES, and whether those agreements alone, or additional agreements and representations, control the relationship between the parties. Indeed, the basis for much of DuPont's argument for summary judgment is that the distributor agreements preclude Plaintiff's claims. Because the 2000 Agreement unquestionably was in effect when NES was terminated, the Court will consider that document and its implications.

Several provisions of the 2000 Agreement are germane to the parties' arguments. Most importantly, the 2000 Agreement contained an explicit termination provision,

which stated: "either party may terminate this Agreement with or without cause, upon at least thirty (30) days prior written notice."[26]   (Corian Authorized Distributor Agreement (Docket # 23-8) ¶ 2.A.)  The parties also provided a means for modifying the contract. "This Agreement shall not be amended or modified orally, by usage of trade, or course of dealing and no amendment or modification shall be of any force or effect unless contained in a writing signed by both parties which expressly refers to modification or amendment of this Agreement."[27]   (Id. ¶ 9.F.)  Such a procedure was in fact used by the parties to modify the 2000 Agreement after NES acquired Kilstrom.  Finally, the 2000 Agreement provided that the contract "fully and completely express[es] the entire understanding of the parties with respect to their relationship.  The parties have entered into this Agreement . . . with nether [sic] party relying upon any statement or representation not contained in this Agreement or the Schedules attached hereto."  (Id. ¶ 9.E.)

In opposing summary judgment, Plaintiff proffers numerous arguments regarding the 2000 Agreement.[28]   Plaintiff first asserts that numerous contracts controlled the

---

[26]     The Zodiaq® contract contained a termination provision identical to that contained in the 2000 Corian® Agreement, and the Simplicity™ contract explicitly stated: "The parties agree all of the terms and conditions, including rights of termination, of the Corian® Distributor Agreement, shall govern this Agreement . . . ."  (Docket # 121-4 ¶ 1.).

[27]     In addition, the Zodiaq® contract provided: "These terms and conditions supersede any of previous date and no modification thereof shall be binding on DuPont unless separately contracted in writing and agreed to by a duly authorized representative of DuPont."   (Docket # 118-3 ¶18.)  The Simplicity™ contract explicitly stated: "The parties agree all of the terms and conditions, including rights of termination, of the Corian® Distributor Agreement, shall govern this Agreement . . . ."  (Docket # 121-4 ¶ 1.)

[28]     Plaintiff also argues that the contracts should be interpreted as contracts of adhesion.  As a result, Plaintiff asserts that any ambiguities should be construed against the drafter and that an adhesion contract implies unconscionability.  First, as discussed below, the Court finds no pertinent ambiguities in the contract.  Second, the Court has already discussed unconscionability in its October 20, 2006 Order on Motion to Dismiss (Docket # 71 at 12-14).  As a result, the Court will not analyze whether the contract is one of adhesion.

relationship of the parties such that the Court should be unable to rely on the termination provision in the 2000 Agreement.  The record before the Court demonstrates that at any given time, different agreements were in place.  For example, there were separate written agreements for Corian®, Zodiaq® and Simplicity™.  In addition, the 2000 Agreement provided that every year, NES and DuPont would agree to one and three year business plans for NES.  Nonetheless, the three agreements just mentioned contained termination provisions similar or identical to that contained in the 2000 Agreement.  Beyond these agreements and the business plans provided for in the contract, Plaintiff offers only bald assertions that other agreements controlled the relationship.[29]  Plaintiff has failed to raise a genuine issue of material fact as to the existence of other controlling contracts.  Thus, for purposes of deciding the summary judgment motion presently before the Court, the Court will focus on the 2000 Agreement.

Plaintiff next claims that the termination provision is ambiguous and, therefore, there is a genuine issue of material fact regarding what constitutes reasonable notice of termination.  Plaintiff asserts that the ambiguity arises from the inclusion of the words "at least" in the termination provision.[30]  Plaintiff argues:  "The common sense meaning of the phrase 'at least' in modifying a period of time is 'no less than,' so the termination provision in the Corian Agreements must be read to mean that the terminated party would be entitled to *no less than* 30 days' notice under the best of circumstances."

---

[29]    For example, the Affidavit of Robert Dion, Jr. in Opposition to Defendants' Motions for Summary Judgment states at paragraph 7: "NES distributed DuPont products pursuant to a number of agreements, some written, some oral, and some derived from the customer and practice of the parties over the course of our thirty-five year history."  (Docket # 177 ¶ 7.)  In his oral deposition, Dion stated, "[w]e had many, many, many more agreements and contracts than just this . . . ."  (Docket # 174-8 at 27.)

[30]    Although Plaintiff claims that the words "at least" appeared for the first time in the 1997 Agreement, the 1991 Agreement provided that the agreement would continue "unless and until termination by either party, with or without cause, upon at least thirty (30) days prior written notice."

(Memorandum of Law in Opposition (Docket # 178) at 11.)  Thus, Plaintiff argues, the circumstances surrounding the termination must be considered when evaluating what was reasonable.

Courts should give the terms in a contract their plain meaning.  <u>Hallowell v. State Farm Mut. Auto. Ins. Co.</u>, 443 A.2d 925, 926 (Del. 1982) (stating that "if the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them"); <u>see</u> <u>also</u> <u>Cont'l Ins. Co. v. Rutledge & Co.</u>, 750 A.2d 1219, 1228 (Del. Ch. 2000).  Despite Plaintiff's argument, "at least thirty days notice" is not an ambiguous term in a contract; the phrase is not subject to multiple interpretations.  The Court will not look behind or distort the clear terms of the contract to determine what would have been reasonable.  <u>See</u> <u>Hallowell</u>, 443 A.2d at 926 (providing that in the context of an insurance contract, "a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.").  The parties to the contract negotiated and contracted for the mutual right to terminate the agreement upon thirty days' notice.

Finally, Plaintiff argues that the 2000 Agreement was modified such that the thirty day termination provision was not in effect when NES was terminated.  Notably, the 2000 Agreement contained a means to modify the contract.  The modification provision expressly disclaimed oral modification, modification by use or trade and required that all modifications be in writing.  Nonetheless, "contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision."  <u>Cont'l Ins. Co.</u>, 750 A.2d at 1229.  A party claiming an

oral modification must prove the alteration with "such specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document."  Reeder v. Sanford School, Inc., 397 A.2d 139, 141 (Del. Super. Ct. 1979).

Further, a written contract containing a prohibition against amendment except by written document may also be modified by a course of dealing.  See Pepsi-Cola Bottling Co. v. Pepsico, Inc., 297 A.2d 28, 33 (Del. 1972) (finding that an oral agreement regarding pricing between a manufacturer and bottler had been substituted for written pricing provisions in the contract where the bottler had accepted periodic price changes made by the manufacturer over the course of fifteen years).  Where a course of conduct is alleged to have modified the contract, "a subsequent course of conduct must explicitly address the contract provision in order to modify the parties' agreement."  KBQ, Inc. v. E.I. Du Pont de Nemours & Co., 6 F. Supp. 2d 94, 99 (D. Mass. 1998) (citing Pepsi-Cola Bottling Co., 297 A.2d at 32-34).  This high burden ensures that the party asserting the oral modification is not doing so in an attempt to alter negotiated but unfavorable terms to the contract.  See Cont'l Ins. Co., 750 A.2d at 1230.

Here, Plaintiff points to the long course of dealing between the parties and DuPont's characterization of the relationship as one requiring mutual loyalty and trust as evidence that the parties intended to abandon or ignore the thirty day termination provision.  Plaintiff's argument, however, fails as a matter of law.  Plaintiff has pointed to no evidence indicating that either party clearly expressed an intent to modify the termination clause.[31]  The mere existence of a long course of dealing, without more, is

---

[31]     Even assuming the contested statement by John Charamella was made, Plaintiff fails to raise a genuine issue of material fact.  During the course of Citizen's Bank due diligence in advance of loaning

insufficient to modify the termination provision. Further, general statements of loyalty and trust are vague such that the Court is unable to determine, if there were a modification, what the terms of the contract would be. This course of conduct, taken as a whole, is not sufficiently specific and direct to modify the clear and unambiguous termination provision in the contract.

Therefore, the plain and clear language of the contract indicates that either party could terminate the distribution agreement upon at least thirty days' notice, with or without cause. On April 4, 2006, DuPont delivered notices of termination of NES' distributor agreements. The notices stated that the termination would be effective June 4, 2006. DuPont provided more time than required by the agreements in executing the termination. Further, DuPont was not required to provide cause for the termination. Therefore, DuPont is entitled to summary judgment on Count XIV. In addition, where the terms to the contract are clear, the Court will not look behind the contract to determine what is reasonable. See Hallowell, 443 A.2d at 926. Here, the Court will not undertake to determine whether the termination was reasonable, and thus, DuPont is entitled to summary judgment on Count XV.

In addition, Plaintiff asserts that the doctrine of recoupment bars summary judgment on the contract-based claims. The Eighth Circuit has provided: "The doctrine of recoupment is designed to remedy the inequity which arises when a manufacturer, after having required a distributor to make a sizeable investment in the furtherance of a

---

NES $4.5 million, John Charamella indicated to the bank that the agreement between NES and DuPont had a thirty day termination provision that both DuPont and NES could execute, but "that obviously is very difficult to execute given the relative importance of each party to the other." (Plaintiff's SMF ¶ 170.) Notably, Charamella denies ever making such a statement. (Defendant E.I. DuPont de Nemours and Company's Response to New England Surfaces' Statement of Additional Fact (Docket # 183) ¶ 171.) This statement does not clearly express DuPont's intent to modify the termination clause, but rather indicates the challenges inherent in terminating a long-standing business relationship.

distributorship, terminates the working relationship without just cause, leaving the distributor with substantial unrecovered expenditures." Ag-Chem Equip. Co. v. Hahn, Inc., 480 F.2d 482, 486 (8th Cir. 1973). The doctrine of recoupment relating to distributors and manufacturers largely has been recognized as a Minnesota doctrine.[32] Indeed, Plaintiff has failed to proffer a single case where the doctrine is recognized in Delaware and this Court has been unable to locate such a case.

Furthermore, even if the Court were to recognize and apply the doctrine of recoupment to this case, it is doubtful that the doctrine would aid Plaintiff. An initial requirement for the doctrine to apply is that the agreement be terminable at will. Ag-Chem Equip. Co., 480 F.2d at 487. The Third Circuit, applying Minnesota law, found the doctrine of recoupment applicable where the agreement explicitly provided that it was terminable by either party, for any reason, upon sixty days' written notice. Schultz v. Onan Corp., 737 F.2d 339, 347 (3d Cir. 1984). Finding an agreement terminable at will and thus subject to the doctrine of recoupment, even when the parties have negotiated and contracted for a termination "for any reason" clause has been criticized. See Retail Assocs. v. Macy's East, Inc., 245 F.3d 694, 698 (8th Cir. 2001); Best Vendors Co. v. Air Express, Inc., 00-2224, 2002 U.S. Dist. LEXIS 18679, at * 24-26 (D. Minn. Sept. 23, 2002). Under that approach, "the right to equitable recoupment is divorced from breach-of-contract analysis, and recoupment becomes a device by which judges may rescue a

---

[32]     The doctrine of recoupment, as it relates to manufacturers and distributors, is distinct from recoupment that is recognized in Delaware. As recognized in Delaware, "[r]ecoupment rests on the principle of the desirability of avoiding circuity and multiplicity of actions by allowing the defendant, at his election, to give in evidence matters growing out of the same transaction by way of defense instead of requiring a cross action, when it can be done without a violation of principle or great inconvenience in practice; but while it is the policy of our law not to compel parties to bring two actions when with equal convenience their rights can be settled in one, the defendant may not set up his claim by way of recoupment unless it would be just and practicable to adjust it in the plaintiff's action." Edge Moor Iron Co. v. Brown Hoisting Mach. Co., 62 A. 1054, 1055-56 (Del. 1906).

party from its bad bargain by taking money away from the other party, whose conduct has been wholly lawful."  Retail Assocs., 245 F.3d at 698; see also Best Vendors Co., 2002 U.S. Dist. LEXIS 18679, at *24-26.  Rather, the doctrine of recoupment only comes into play where the agreement is silent as to duration or termination. [33]  The Court finds this reasoning persuasive.  Thus, even if the doctrine of recoupment could be applied to this case, it is unlikely that it would be of benefit to Plaintiff.

**B.     Promissory Estoppel (Count XI)**

Count XI asserts a cause of action for promissory estoppel.  In order to state a claim for promissory estoppel, NES must establish by clear and convincing evidence[34] that "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."  Chrysler Corp. v. Chaplake Holdings, Ltd., 822 A.2d 1024, 1032 (Del. 2003).  The promises that form the basis for the claim must be sufficiently definite and certain so that the Court can ascertain the intentions of the parties.  Cont'l Ins. Co., 750 A.2d at 1233; State v. Simpson, 899,

---

[33]     Allied Equipment Company v. Weber Engineered Products, Inc. is also instructive.  237 F.2d 879 (4th Cir. 1956).  There, 'Allied' had distributed the products of 'Weber,' a manufacturer of farm and garden equipment pursuant to an oral agreement that had no set duration or termination.  Id. at 880, 881.  The Fourth Circuit recognized that if Allied had expended money in developing the distributorship pursuant to an understanding with Weber, Allied was entitled to continue the distributorship for a duration that would allow it to recoup those expenses and any others expended in reliance on, and with the knowledge of, Weber.  Id. at 882.  In quoting Williston on Contracts, the Fourth Circuit stated, "[i]t is the settled law of agency that if the agent or employee furnishes a consideration in addition to his mere services, he is deemed to have purchased the employment for at least a reasonable period where the duration of the employment is not otherwise defined."  Id.  Thus, central to the application of recoupment was that the oral agreement had not provided for termination or duration.  See id.

[34]     "The party asserting an estoppel has the burden of proving it by clear and convincing proof.  An estoppel may not rest upon mere inference."  National Fire Ins. Co. v. Eastern Shore Laboratories, Inc., 301 A.2d 526, 529 (Del. Super. Ct. 1973).

1990 Del. Ch. LEXIS 149 (Del. Ch. Sept. 24, 1990) ("In order for a statement to be relied upon as creating an estoppel, its language must be clear and plain.").

Plaintiff offers three promises to form the basis of the count for promissory estoppel: (1) DuPont promised not to terminate NES without cause, (2) DuPont promised to act as a partner with NES, and (3) DuPont promised to be loyal to the interests of NES. (Second Amended Complain (Docket # 65) at 19; Memorandum of Law in Opposition (Docket # 178) at 45.) Plaintiff has brought forward no evidence that DuPont promised, at any time, not to terminate NES without cause.

Plaintiff's two remaining basis for promissory estoppel fail at the first step. Vague statements of acting as a partner and loyalty are not sufficiently clear and definite to form the basis for a valid action of promissory estoppel. By contrast, in King v. Limestone Valley Enters., L.P., Mr. Rappucci owned a beauty salon located in the same shopping center as Ms. King's day spa. 18787-NC, 2002 Del. Ch. LEXIS 47, at *2-7 (Del. Ch. April 24, 2002) Before opening her day spa, Ms. King sought assurances from Mr. Rappucci that he would not offer services that could compete with her intended business. Id. at *3. Based on these representations, Ms. King opened a day spa. Id. at *17-18. The court found that Mr. Rappucci made a definite and clear promise to Ms. King that Mr. Rappucci's salon would not provide day spa services in competition with Ms. King's day spa sufficient to form the basis of a promissory estoppel claim. Id. King v. Limestone Valley Enters., L.P. stands in contrast to the present case. Here the Court is unable to determine what the parties intended based on vague assurances of partnership and loyalty. Dion stated at his deposition that "loyalty" was understood to mean local advertising support. Even with this understanding, the Court must attempt to look behind

the vague statements to ascertain the intentions of the parties.  Further, there is no evidence before the Court that DuPont failed to provide such support.  Thus, Plaintiff has failed to raise a genuine issue of material fact as to the claim for promissory estoppel.[35] The Court grants DuPont summary judgment on Count XI.

**C.      Breach of Covenant of Good Faith and Fair Dealing (Count XII)**

Count XII asserts a cause of action for breach of the covenant of good faith and fair dealing.   The covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract."  Wilgus v. Salt Pond Inv. Co., 498 A.2d 151, 159 (Del. Ch. 1985) (citing Restatement (Second) of Contracts § 205 (1981)); see also Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005).  The covenant of good faith and fair dealing, in Delaware, is best understood as a means of implying terms in an agreement.  A court should invoke the covenant only when

> [it is] clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith – had they thought to negotiate with respect to that matter. If the answer to this question is yes, then . . . a court is justified in concluding that such act constitutes a breach of the implied covenant of good faith.

Katz v. Oak Industries, Inc., 508 A.2d 873, 880 (Del. Ch. 1986).  Courts have emphasized that use of the covenant of good faith and fair dealing should be rare, fact

---

[35]      Because the Court finds that the statements are not sufficiently clear and definite to form the basis of a claim for promissory estoppel, it need not reach whether any reliance by Plaintiff was reasonable. Nonetheless, the Court notes the challenge for Plaintiff to establish justifiable reliance upon statements that appear to contradict the terms of the 2000 Agreement.  See In re U.S. West, Inc. Secs. Litig., 201 F. Supp. 2d 302, 308 (D. Del. 2002).

intensive and governed solely by issues of compelling fairness.  Cont'l Ins. Co., 750 A.2d at 1234.

Plaintiff claims that DuPont violated the covenant by failing to disclose its intention to terminate NES, terminating upon only sixty days' notice and doing so without cause.  DuPont counters that the covenant cannot be construed to require performance or a condition that is in conflict with an express provision of the contract. Indeed, "[e]xisting contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty . . . unattached to the underlying legal document.  Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement."  Dunlap, 878 A.2d at 441.  By asserting that DuPont should have disclosed the termination earlier, provided more notice or not terminated without cause, Plaintiff essentially seeks to modify the terms of the contract.  The parties specifically addressed termination in the contract; the covenant of good faith and fair dealing will not be used to rewrite the contract.

Furthermore, Plaintiff's New Jersey Supreme Court decisions cited in support are inapposite.  See Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575 (N.J. 1997); Bak-A-Lum Corp. v. Alcoa Building Products, Inc., 351 A.2d 349 (N.J. 1976).  For example, in Bak-A-Lum Corp. v. Aloca Bldg. Products, Inc., the New Jersey Supreme Court found a breach of the covenant where the Defendant had decided to terminate Plaintiff's distributorship, and withheld that information while encouraging Plaintiff in a major expansion and signing a five year lease.  351 A.2d at 351-52.  In the case before the Court, however, NES acquired the Kilstrom distributorship in 2002 and expanded in

2004, but the earliest DuPont began to consider termination was late 2005.  The issues of compelling fairness present in <u>Bak-A-Lum</u> are simply not present with regard to DuPont's termination and its performance related to termination.  DuPont is therefore entitled to summary judgment on this claim to the extent the claim centers on NES' termination.

Plaintiff also argues that DuPont violated the covenant when DuPont acquired NES' customer lists and sales data through false representations.  In February 2006, DuPont invited all distributors of Corian® products to participate in the "Get a Cool Deal on Corian" promotion and requested that the distributors submit certain data to DuPont. In March 2006, a DuPont representative requested that NES provide a more accurate customer list and stated that NES' participation in the promotion would be approved once the information was received.  **[REDACTED]**  Genuine issues of material fact exist with regard to the conduct surrounding the acquisition of the customer lists.  DuPont's motion for summary judgment as to Count XII is denied as to the customer lists.

**D.**     **Breach of Fiduciary Duty (Count VIII)**

Count VIII asserts a claim for breach of fiduciary duty against DuPont.  At the threshold, the Court must determine whether a fiduciary relationship existed between DuPont and NES.  Under Maine law, in order to establish a fiduciary relationship there must be "(1) the actual placing of trust and confidence in fact by one party in another, and (2) a great disparity of position and influence between the parties at issue." <u>Bryan R. v. Watchtower Bible & Tract Soc'y, Inc.</u>, 738 A.2d 839, 846 (Me. 1999) (quoting <u>Morris v. Resolution Trust Corp.</u>, 622 A.2d 708, 712 (Me. 1993)).  Fiduciary relationships have been found to exist in numerous situations, including between business partners, families

engaged in financial transactions and among shareholders in a close corporation.[36]  See id. (collecting cases).  The finding of a fiduciary duty "may be based on moral, social, domestic, or merely personal duties, [but] it does not arise merely because of the existence of kinship, friendship, business relationships, or organizational relationships." Id. (internal citations and quotations omitted).

In Maine, the Law Court has found that a franchise-like relationship is generally insufficient to find a fiduciary relationship.  See Webber Oil Co. v. Murray, 551 A.2d 1371, 1375 (Me. 1988).  In Webber Oil Co. v. Murray, Webber agreed to provide gasoline to the public through pumps owned by Webber at a convenience store owned by Murray.  Id. at 1373.  Murray staffed the pumps, collected the sales and paid the proceeds to Webber.  Id.  Through the course of their relationship, Webber loaned money to Murray, and Murray and his wife signed promissory notes to Webber.  Id.  While acknowledging that other courts have found a fiduciary relationship between franchisor and franchisee, the Law Court declined to find a fiduciary relationship in this situation. Id. at 1375.  "The evidence here showed no such relationship, but rather only a conventional business deal. Certainly one party was economically stronger than the other, but that is often the case in a business deal, and not the basis for a finding of a relationship of confidence."  Id.

Ordinarily, a business relationship like that between NES and DuPont will not give rise to fiduciary duties.  See, e.g., KBQ, Inc., 6 F. Supp. 2d at 101; Webber Oil Co., 551 A.2d at 1375.  There has been no showing that NES was completely dependent on DuPont and necessarily reposed trust and confidence in DuPont.  Rather the evidence

---

[36]     Notably, Plaintiff asserts that a fiduciary relationship can be found in many relationships, including between principal and agent, joint venturers and franchisor and franchisee.  Yet Plaintiff fails to substantiate that any of these relationships existed between DuPont and NES.

before the Court shows that DuPont generally encouraged trust, confidence and loyalty between the two parties.  Mere recitations and references to trust, however, are insufficient to give rise to fiduciary duties.  While NES believed that it wielded little power against DuPont, like DuPont, NES was free to terminate the contract upon thirty days notice.  DuPont did have some voice in the management of NES, such as reviewing business plans as provided in the contract and discouraging NES from carrying competing business lines, but that involvement did not rise to the level required to find a fiduciary relationship.  See KBQ, Inc., 6 F. Supp. 2d at 101.  Because there is no fiduciary relationship between these two business entities, DuPont is entitled to summary judgment on Count VIII.

**E.      Breach of Fiduciary Duty (Count IX)**

DuPont and Parksite move for summary judgment on Count IX, which asserts a claim for breach of fiduciary duty.  For the reasons previously stated, summary judgment is granted with respect to the claim against DuPont.

Parksite moves for summary judgment on Count IX on the ground that no fiduciary relationship exists between NES and Parksite.  **[REDACTED]**  Ordinarily, a court will not find a fiduciary relationship among two corporations whose relationship is governed by a contract.  "Maine . . . recognizes a fiduciary obligation only when 'the relations between two persons are such that one is completely dependent and relies upon and necessarily reposes confidence in the other.'"  Webber Oil Co., 551 A.2d at 1375 (quoting Small v. Nelson, 16 A.2d 473, 475 (Me. 1940)).

**[REDACTED]**

First, vague statements of trust and assertions of agency are insufficient to give rise to fiduciary duties. <u>See</u> <u>Bryan R.</u>, 738 A.2d at 846. **[REDACTED]** To the contrary, the evidence shows that these two companies signed an arms-length contract **[REDACTED]**. <u>See</u> <u>Leighton v. Fleet Bank of Maine</u>, CV-91-1208, 1992 Me. Super. LEXIS 96, at *20 (Me. Super. Ct. April 15, 1992) (finding no fiduciary duty where the parties dealt with each other at arms length); <u>Diversified Foods, Inc. v. First Nat'l Bank of Boston</u>, CV-89-1073, CV-89-1082, 1991 Me. Super. LEXIS 84, at *50-51 (Me. Super. Ct. April 18, 1991) (stating that experienced business entrepreneurs who had previously negotiated the terms of loans with banks could not articulate a fiduciary relationship with a bank); <u>Marquis v. State</u>, CV-89-83, 1991 Me. Super. LEXIS 46, at *17 (Me. Super. Ct. Feb. 13, 1991) (stating that "parties to a contract who bargain at an arms-length with each other do not undertake any special relationship."). **[REDACTED]** <u>See</u> <u>Bryan R.</u>, 738 A.2d at 846 ("A fiduciary duty will be found to exist, as a matter of law, only in circumstances where the law will recognize . . . a reasonably basis for the placement of trust and confidence in the superior party . . . ."). The Court declines to find a fiduciary relationship between two independent companies who join together under contract **[REDACTED]**. Parksite is entitled to summary judgment on Count IX.

## F.     The Connecticut Franchise Act (Count I)

Turning to Count I, Plaintiff asserts a claim for violation of the Connecticut Franchise Act, Conn. Gen. Stat. § 42-133e <u>et</u> <u>seq.</u>, which prohibits a franchisor from terminating or failing to renew a franchise, except for good cause.[37]  <u>Id.</u> § 42-133f(a). The Act, however, only applies to franchise agreements "the performance of which

---

[37]     Defendants do not contest, and the court accepts for purposes of summary judgment, that Plaintiff qualifies as a franchisee under the Connecticut Franchise Act.

contemplates or requires the franchisee to establish or maintain a place of business in this state." Id. § 42-133h. Further, "it is doubtful that the Connecticut franchise law applies extraterritorially." H.J., Inc. v. Int'l Tel. & Tel. Corp., 867 F.2d 1531, 1546 (8th Cir. 1989); accord Forbes v. Joint Med. Prods. Corp., 976 F. Supp. 124, 126 (D. Conn. 1997). There is little case law to guide the Court on what is required for the parties to "contemplate" a place of business in Connecticut. It is clear, however, that a choice of law provision within a contract indicating that Connecticut law will govern is insufficient. Forbes, 976 F. Supp. at 126 (finding that a choice of law provision designating that Connecticut law would govern the relationship did not satisfy the geographical requirement).

While the Connecticut Franchise Act is remedial in nature, Hartford Elec. Supply Co. v. Allen-Bradley Co., 736 A.2d 824, 831 (Conn. 1999), Plaintiff has failed to raise a genuine issue of material fact as to whether the Connecticut Franchise Act applies to this case. Rather, the evidence before the Court shows that no agreement required that NES maintain a place of business in Connecticut. The parties dispute, however, whether the performance of the agreement contemplated that NES establish or maintain a place of business in Connecticut.

First, the 2000 Agreement contained a choice of law provision, which stated that Delaware law would govern any rights or remedies arising from the contract. Although Courts have held that a choice of law provision is insufficient to satisfy the jurisdictional requirement of a state's franchise act, see, e.g., Diesel Injection Serv. v. Jacobs Vehicle Equip., 980582400S, 1998 Conn. Super. LEXIS 3710, at *8-9 (Conn. Super. Ct. Dec. 4, 1998) (collecting cases), the Delaware choice of law provision also makes clear that the

parties in this case did not intend for Connecticut law, or the Connecticut Franchise Act, to apply to the relationship. As stated by a Connecticut Superior Court:

> Theoretically, parties might specifically contemplate that a franchise relationship law will apply in states other than that in which the law was enacted. Such a case is so unlikely in a franchise context, however, that it may never rise above the level of theory. Franchise contracts are drafted by franchisors, and it is not in their interest to expand the application of franchise relationships laws. Accordingly, it is reasonable to start from the presumption that the contract did not contemplate that such would apply beyond the territory in which it was enacted.

Id. at *10-11 (quoting T. Pitegoff, "Choice of Law in Franchise Relationships: Staying Within Bounds," 14 Franchise L. J. 89, 117 (1995)).

Further, in 2002, NES acquired the Kilstrom distributorship, which included a distribution facility in Connecticut. At that time, NES and DuPont amended the 2000 Agreement to expand NES' GMA to include most of Connecticut and most of Massachusetts, but no other provisions of the contract were modified or altered. The 2000 Agreement also provided that it contained the full understanding of the parties. Had the parties intended for NES to establish or maintain a place of business in Connecticut or for the Connecticut Franchise Act to apply, they could have included this understanding when the 2000 Agreement was amended. Plaintiff points to the inclusion of portions of Connecticut within NES' GMA to show that DuPont was aware that NES purchased the former Kilstrom distributorship, which included a distribution facility.

In addition, NES proffers the deposition testimony of Dion in opposing summary judgment. Construing all inferences in favor of Plaintiff, the deposition testimony shows that there were few, if any, conversations between NES and DuPont regarding how NES would conduct distribution in Connecticut after the acquisition of Kilstrom and modification of the GMA. The deposition testimony shows that NES believed that it was

"maintaining the status quo" by continuing operations in the distribution facility in Connecticut.  NES has adduced no evidence to show that this was a belief common to DuPont or reflected in the agreements.  Indeed, while DuPont was aware of the acquisition and may have been aware of the facility, Plaintiff has failed to bring forward sufficient evidence to create a genuine issue of material fact that the performance of the agreement, and the parties, contemplated that NES would establish or maintain a place of business in Connecticut beyond NES' own beliefs and understandings.  There is no evidence that DuPont contemplated that NES would establish or maintain a place of business in Connecticut beyond conjecture and assumption.  Accordingly, DuPont is entitled to summary judgment on Count I.

## G.    Fraud and Misrepresentation (Count VI)

In Count VI of the Complaint, NES asserts a cause of action for fraud and misrepresentation.  In order to recover for fraud, a plaintiff must establish by clear and convincing evidence that Defendant "(1) ma[de] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relie[d] upon the representation as true and act[ed] upon it to his damage." Jourdain v. Dineen, 527 A.2d 1304, 1307 (Me. 1987) (quoting Letellier v. Small, 400 A.2d 371, 376 (Me. 1979)).

NES proffers three sets of statements that form the basis of the fraud count: (1) DuPont encouraged NES to expand throughout New England while promising that DuPont would support and be loyal to NES; (2) DuPont intentionally decided not to inform NES that it was going to be terminated although the plan was in place before NES

was notified, and (3) DuPont obtained NES' customer lists, marketing information and sales data under the false representation that NES would participate in the "Cool Deal" promotion.  At the threshold, the Court must consider whether the statements made by DuPont are actionable.

In Maine, a statement of opinion or mere puffery is insufficient to form the basis of a count for fraud.  See Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 65 (1st Cir. 1992); Shine v. Dodge, 157 A. 318, 319 (Me. 1931) (stating that "there is no liability in an action of deceit for a false statement of an opinion.").  A person cannot justifiably rely upon a statement of opinion or puffery.  In Schott Motorcycle Supply, Inc. v. American Honda Motor Co., a franchisee decided to sell solely Honda motorcycles after speaking with representatives of the franchisor and receiving assurances that "Honda would remain just as committed to the motorcycle industry as it had been in the past and that new Honda products and programs would cause an increase in Honda sales, enough to make up for the loss of sales from [other brands and items]." 976 F.2d at 60.  The First Circuit, applying Maine law, stated "[t]hese general statements in the context of franchisor-franchisee communications constitute nothing more than 'puffing' or 'trade talk,' upon which no reasonable person would rely."  Id. at 65.  The Court finds similarly here.  Broad statements of encouragement, loyalty and support are mere puffery, on which a sophisticated business entity, such as NES, could not reasonably rely.  See also Shine, 157 A. at 319 ("If [the statement] consists of nothing more than dealer's talk, or if it is an averment of a fact and the person to whom it is made has equal means with the maker of knowing the truth, the rule of *caveat emptor* applies, and the one relying on it does so at his peril.").

The second category of statements relates to Plaintiff's averment that DuPont withheld that NES was going to be terminated even though DuPont made the decision at an earlier point in time.   Plaintiff has not alleged that there was an affirmative misrepresentation; rather the gist of Plaintiff's claim is that DuPont engaged in fraud by not telling Plaintiff earlier of its impending termination.   "Where there is no affirmative misrepresentation by the defendant, in order to prove fraud a plaintiff must demonstrate an active concealment of the truth or a special relationship that imposes a duty to disclose on the defendant. . . . 'Active concealment of the truth' connotes steps taken by a defendant to hide the true state of affairs from the plaintiff."   Kezer v. Mark Stimson Assocs., 742 A.2d 898, 905 (Me. 1999).   First, no special relationship existed between NES and DuPont such that DuPont had a duty to disclose.   Plaintiff's argument fails as a matter of law because silence, a mere failure to disclose, without more, is insufficient for a claim of fraud.   Plaintiff has failed to create a genuine issue of material fact regarding whether DuPont engaged in active concealment.   To the contrary, the record shows that NES was on Critical Review for three years before it was terminated.   In numerous communications with NES, DuPont reminded NES that it remained on Critical Review and could be terminated, with or without cause.   DuPont repeatedly reminded NES of the possibility of termination.   Therefore, DuPont's failure to state at an earlier time that it intended to terminate NES is not actionable.

The Court finds that genuine issues of material fact persist with regard to the third category of statements.   NES has offered "significant probative evidence tending to support the complaint" with regard to its claim for fraud based on the representations related to the customer lists.   See Anderson, 477 U.S. at 256.   Therefore, summary

judgment for Count VI is granted to the extent the count is based on the first two categories of representations but denied with respect to the third category of statements.

**H.      Negligent Misrepresentation (Count VII)**

DuPont moves for summary judgment on Count VII, which states a cause of action for negligent misrepresentation.  In <u>Chapman v. Rideout</u>, the Law Court adopted the Restatement (Second) of Tort's formulation of negligent misrepresentation.  568 A.2d 829, 830 (Me. 1990).

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

<u>Id.</u> (quoting Restatement (Second) of Torts § 552(1) (1977)).  Plaintiff's proffered negligent misrepresentations can be grouped into three categories: (1) DuPont failed to exercise reasonable care in encouraging NES to expand throughout New England while promising loyalty and support,[38] (2) DuPont failed to exercise reasonable care in communicating that NES' distribution rights would not be terminated without cause, and (3) DuPont failed to exercise reasonable care in communicating information used to obtain the customer lists and Data.

Summary judgment is appropriate as to the statements of encouragement, loyalty and support for the same reason articulated under the fraud count.  Both fraud and negligent misrepresentation require a false representation of fact.  <u>Kearney v. J.P. King</u>

---

[38]      Specifically, Plaintiff alleges that DuPont failed to exercise reasonable care in communicating its willingness and ability to support NES and be a loyal partner as NES expanded throughout New England, that NES should take over the Kilstrom distributorship, that DuPont would support NES diligently, that DuPont "would be there" for NES every step of the way.  (Second Amended Complaint (Docket # 65) at 15.)

Auction Co., 265 F.3d 27, 34 n.8 (1st Cir. 2001) ("Claims for fraudulent and negligent misrepresentation, although obviously distinct, both require that the defendant have made a false representation of present fact and that the plaintiff justifiably relied on the representation as true."). Encouragement and promises of loyalty and support are a type of "trade talk" or "puffery," on which NES, as a business entity could not justifiably rely.

Further, NES has failed to raise a genuine issue of material fact with regard to the second category of statements. The record evidence before the Court is devoid of any evidence or continuing allegation by Plaintiff that any representative of DuPont stated that NES would not be terminated without cause. Rather, the record is replete with evidence showing that DuPont, in the later years of the contract, reminded NES of the termination provision in the contract. Therefore, summary judgment is appropriate on Count VII regarding the first and second categories of statements.

DuPont's primary argument against negligent misrepresentation is that the DuPont employees who made the misrepresentations lacked the pecuniary interest necessary for the tort. DuPont claims that application of the tort is limited "to individuals such as professionals providing information for a charge or like a seller of real estate who receives a direct economic benefit." (DuPont's Motion for Summary Judgment (Docket # 109) at 15.) DuPont's proposed interpretation would unnecessarily limit the scope of the tort. Comment d. to the Restatement provides that while the pecuniary interest will normally be in the form of a payment, it need not be so direct. Restatement (Second) of Torts § 552(1) cmt. d. For example,

> the officers of a corporation, although they receive no personal
> consideration for giving information concerning its affairs, may have a
> pecuniary interest in its transactions, since they stand to profit indirectly
> from them . . . . The fact that the information is given in the course of the

> defendant's business, profession or employment is a sufficient indication
> that he has a pecuniary interest in it, even though he receives no
> consideration for it at the time.

Id. Defendant's argument is insufficient as a basis to grant summary judgment.

Moreover, Plaintiff has raised a genuine issue of material fact regarding whether the individuals made the statements "in the course of [their] business, profession or employment . . . or in any other transaction in which [they] [had] a pecuniary interest."

Id. Therefore, summary judgment is denied on Count VII to the extent the claim is based on representations surrounding the acquisition by DuPont of NES' customer list.

## I.     Tortious Interference with Contractual Rights and Prospective Economic Interests (Count XIII)

DuPont and Parksite move for summary judgment on Count XIII, which states a cause of action for tortious interference with contractual rights and prospective economic interests.  In order to recover on that claim, a plaintiff must prove: "(1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages."   Rutland v. Mullen, 798 A.2d 1104, 1110 (Me. 2002). Fraud or intimidation is vital to a claim for tortious interference "because it distinguishes unlawful conduct from conduct inherent in a healthy competitive economic environment." Id. at 1110 n.5.

Intimidation is not limited to frightening an individual or corporation for coercive purposes.  Instead, in Pombriant v. Blue Cross/Blue Shield of Maine, Pombriant was the insurance broker of record for Bennet, a shoe manufacturing and importing company. 562 A.2d 656, 657-58 (Me. 1989).  Pombriant contracted with Blue Cross to be one of a limited number of its brokers in Maine.  Id.  The Law Court supported a jury verdict that

Blue Cross had tortiously interfered with a contractual relationship by "the intimidating means of making it clear to Bennett that the only manner in which it could avail itself of Blue Cross's lower rates for the desired insurance would be by using the brokerage services of [a different broker] . . . ." Id. at 659.

Plaintiff's claim centers on DuPont and Parksite's tortuous interference with NES' contractual rights and prospective economic interests with its customers. Nonetheless, DuPont spends the majority, and Parksite spends the entirety, of their motions arguing that they cannot be held liable for any interference with NES' contract with DuPont.[39]  This, however, is not the gravamen of Plaintiff's claim or argument.

To the extent DuPont addresses any interference with NES' contractual rights or prospective economic interests with its customers, DuPont relies on language within the 2000 Agreement.  Section 2.C. of the Agreement states:

> DUPONT shall have no liability of any kind whatsoever . . . to [NES] for DUPONT's communications (including without limitation communications identifying the new AUTHORIZED DISTRIBUTOR) with past, present, or prospective purchasers or users of Products when such communications pertain to termination of [NES].

(Corian Authorized Distributor Agreement (Docket # 23-8) at ¶ 2.A (emphasis added).)

In support of its claim, NES proffers that some NES customers were told by agents of Defendants that NES was going out of business and thus need not pay amounts due.

---

[39]  Parksite also claims that the economic loss doctrine bars Plaintiff's tort claims.  In Oceanside at Pine Pont Condo. Owners Ass'n v. Peachtree Doors, Inc., the Law Court recognized the economic loss doctrine.  659 A.2d 267 (Me. 1995).  In Peachtree, unit owners in a condominium sued the manufacturer of windows installed in the condominiums.  Id. at 268-69.  The Law Court disallowed tort recovery and instead stated that: "Plaintiffs' claims for economic damages – 'the costs of all repairs, renovation, corrections and replacements related to the Defendant's defective performance of its contract' – are properly addressable under a warranty theory."  Id. at 271.  The Law Court has not since addressed the economic loss doctrine, although the Federal District Court has held the doctrine applicable to professional service contracts.  Maine Rubber Int'l v. Envtl. Mgmt. Group, Inc., 298 F. Supp. 2d 133, 137-38 (D. Me. 2004).  The rationale underlying the doctrine is that where two parties have negotiated and executed a contract to control their relationship, tort actions should not replace a claim for breach of contract.  See id.  That rationale does not apply to this cause of action because the contract breached or interfered with is not that between Plaintiff and Parksite, but between Plaintiff and its customers.

Further, during meetings with NES' customers during the initial thirty day period, DuPont representatives informed the customers that following the initial thirty day period, they would need to contract with DuPont to receive DuPont materials.  Based on this evidence, the Court finds a genuine issue of material fact as to whether the communications fall within Section 2.C. of the contract and whether Defendants tortiously interfered with Plaintiff's contractual rights and prospective economic interests. Therefore, summary judgment is not appropriate for either defendant on Count XIII.

**J.      Misappropriation of Confidential Information (Count XVII)**

In Count XVII, NES asserts a claim labeled "misappropriation of confidential information."  Specifically, NES alleges that DuPont and Parksite used proprietary and confidential information that belonged to NES, which constitutes "misappropriation of trade information and/or trade secrets, improper acquisition of trade secrets, and/or breach of a duty of confidence."  (Second Amended Complaint (Docket # 65) at 23). From the Second Amended Complaint and Plaintiff's opposition to the motions for summary judgment, it is not clear whether Plaintiff is asserting a common law or statutory cause of action.

To the extent Plaintiff seeks to assert a statutory cause of action,  Maine has adopted the Uniform Trade Secrets Act, 10 M.R.S.A. § 1541, et seq.  At the threshold of this claim, the Court must determine whether the information at issue qualifies as a trade secret.  Spottiswoode v. Levine, 730 A.2d 166, 174 (Me. 1999).  To qualify as a trade secret, the information must "(1) derive 'independent economic value, actual or potential, from not being generally known [or] readily ascertainable'; and (2) be 'the subject of efforts that are reasonable under the circumstances - to maintain its secrecy.'"  Id. at 174-

75 (citing 10 M.R.S.A. § 1542(4)).  The Law Court has articulated several factors for a court to consider to determine whether the information has been the subject of reasonable efforts to maintain the secrecy of the information:

> (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which employees and others involved in the plaintiff's business know the information; (3) the nature and extent of measures the plaintiff took to guard the secrecy of the information; (4) the existence or absence of an express agreement restricting disclosure; and (5) the circumstances under which the information was disclosed to any employee, to the extent that the circumstances give rise to a reasonable inference that further disclosure without the plaintiff's consent is prohibited.

Id. at 175 n.7 (citing Moore v. Marty Oilman, Inc., 965 F. Supp. 203, 217 (D. Mass. 1997)).  Defendants have made a preliminary showing that no genuine issue of material fact exists with regard to Plaintiff's measures to protect the information.  Indeed, the record shows that Plaintiff failed to take any steps to maintain the information's secrecy. Plaintiff failed to indicate on the customer list that it was in any way secret or confidential, to secure or seek a commitment from DuPont for restrictions on the information's use, nor did Plaintiff engage in any measures to ensure employees of NES would preserve the secrecy of the list.

To the extent Plaintiff seeks to assert a cause of action under the common law, Plaintiff has made no attempt to articulate such a cause of action or point to supporting law.  Rather Plaintiff cites two cases for the propositions that customer information constitutes good will, which is an asset with significant value, and that there is an expectation that customer lists are confidential and need not be officially designated as confidential to be protected.  Lord v. Lord, 454 A.2d 830 (Me. 1983); Chapman & Drake v. Harrington, 545 A.2d 645, 647 (Me. 1988).  While customer lists may constitute good will, the cited case does not support that customer lists are automatically confidential.

Chapman & Drake, 545 A.2d at 647-48 (providing that it was reasonable to have an employee sign a non-competition agreement where the employee had access to confidential information, including the customer list, and the opportunity to develop contacts with the customers).

Because Defendants have made a preliminary showing that no genuine issue of material fact exists, NES must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., 200 F.3d at 2 (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). Plaintiff responds to the argumentation of Defendants by stating "[t]he reasons Parksite puts forth explaining the 'failure' of NES' UTSA claim turn on material issues of fact which are disputed, precluding summary judgment." (Docket # 178 at 52 n.30.) The Court does not agree. Plaintiff's conclusory statements that it was generally understood in the industry that customer lists constitute proprietary information is insufficient. Because Plaintiff has failed to bring forward evidence to establish a genuine issue of material fact, summary judgment is appropriate for both Defendants on Count XVII.

**K.      Aiding and Abetting Tortious Conduct (Count X)**

Turning to Count X, Plaintiff asserts a cause of action for aiding and abetting tortious conduct against DuPont and Parksite. Plaintiff cites no case law in support of this cause of action. Although a few decisions have indicated that Maine may recognize the independent tort of aiding and abetting tortious conduct, this Court declines to recognize and extend a cause of action where the Law Court has not previously done so.

Those cases that find a cause of action for aiding and abetting cite to section 876 of the Restatement of Torts. See FDIC v. S. Prawer & Co., 829 F. Supp. 453, 457 (D.

Me. 1993) (citing <u>Barnes v. McGough</u>, 623 A.2d 144 (Me. 1993)); <u>LDDS Commc'ns, Inc. v. Robbins</u>, CV-93-1135, 1994 Me. Super. LEXIS 474, at *9 n.6 (Me. Super. Ct. Sept. 14, 1994).  Notably, the Law Court has not addressed or cited to this section of the Restatement.[40]  In <u>Barnes v. McGough</u>, the Law Court found that a complaint stated a cause of action against lawyer defendants for fraud, interference with advantageous relations and intentional infliction of emotional distress and noted that the complaint alleged more than just legal representation.  <u>Barnes v. McGough</u>, 623 A.2d 144, 146 (Me. 1993).  Rather, the complaint alleged "that the attorneys themselves committed tortious acts and that they substantially encouraged and assisted the tortious actions of their clients, the McGoughs."  <u>Id.</u>  When the case returned for review, the Law Court noted that it had previously found that Plaintiffs had stated a cause of action for "fraud, aiding and abetting fraud, interference with advantageous relationship, aiding and abetting interference with advantageous relationship, and intentional infliction of emotional distress."  <u>Barnes v. Zappia</u>, 658 A.2d 1086, 1089 (Me. 1995).  Nonetheless, when the Law Court discussed the propriety of the grant of summary judgment as to each claim, the Court discussed the elements of the underlying torts, not aiding and abetting.  <u>See</u> <u>id.</u>

To state a cause of action under section 876, a plaintiff must allege tortious conduct by another.  If this is a distinct cause of action from civil conspiracy, the Law Court's rationale in disallowing civil conspiracy is telling.  Civil conspiracy is generally

---

[40]     Section 876 provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876.

not an independent tort in Maine.[41]  Cohen v. Bowdoin, 288 A.2d 106, 110 (Me. 1972). "'[C]onspiracy' fails as the basis for the imposition of civil liability *absent the actual commission of some independently recognized tort*; and when such separate tort has been committed, it is *that tort*, and not the fact of combination, which is the foundation of the civil liability."  Id.; see also Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell, 708 A.2d 283, 286 (Me. 1998).  Thus, like civil conspiracy, where a separate tort has been committed, it is that tort and not aiding and abetting the commission of the tort that forms the cause of action.  Therefore, summary judgment is appropriate on Count X as to both Defendants.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment are GRANTED IN PART and DENIED IN PART.  (Docket #s 109 & 112.)  Specifically, as to the claims against DuPont summary judgment is GRANTED as to Counts I, VIII, IX, X, XI, XIV, XV and XVII, GRANTED IN PART and DENIED IN PART as to Counts VI, VII and XII, and DENIED as to Count XIII.  Summary judgment is GRANTED as to Counts IX, X and XVII against Parksite and is DENIED on Count XIII against Parksite.

---

[41]   In Cohen v. Bowdoin, the Law Court recognized that

in particular extraordinary circumstances there has been recognized the existence of a separate self-sufficient and independent tort of "conspiracy", as a substantive basis of civil liability, when it is shown that combination and the force of numbers inject a special and unique factual overlay of some additional element worthy of recognition as a basis for the imposition of tort liability (such as, for example, coercion, undue influence or restraint of trade) and which would be absent were the conduct to be undertaken by one person acting alone.

Cohen, 288 A.2d at 110.  Plaintiff has failed to "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue" showing extraordinary circumstances.  See Triangle Trading Co., 200 F.3d at 2 (citation and internal punctuation omitted).  Furthermore, the Court's research failed to unearth a case where a court in Maine affirmatively applied this narrow exception to allow recovery for civil conspiracy.

DuPont's Motion for oral argument is DENIED.  (Docket # 125.)  In addition, Defendant

Parksite, Inc.'s Motion for Sealing of Documents is GRANTED.  (Docket # 114.)

**SO ORDERED.**

/s/ George Z. Singal
Chief United States District Judge

Dated at Portland, Maine, this 14th day of September, 2007